EDMUNDS, Justice.
On 5 January 1998, defendant James Lewis Morgan was indicted for the murder of Patrina Lynette King (King). He was convicted of first-degree murder on the basis of premeditation and deliberation. Following a capital sentencing proceeding, the jury recommended a sentence of death, and the trial court entered judgment accordingly.
The State's evidence at trial showed that defendant and his nephew, Kenneth Cato (Cato), were living at 13 Ridge Street in Asheville. On the evening of 25 November 1997, Cato arrived home around midnight to find defendant and King sitting in the living room. They appeared to him to have been smoking crack cocaine, and Cato heard defendant tell King that he wanted a"head job." When King refused and tried to depart, defendant started shouting and smacked her. Defendant also grabbed a beer bottle by the neck, threatened Cato with it, and ordered him to leave. Although Cato stepped out of the room, defendant continued hitting King. Cato told defendant to stop, then reentered the room and began to wrestle with defendant. During their struggle, defendant hit Cato on the head with the beer bottle, then chased Cato outside and around a vehicle parked on Ridge Street. According to Cato, defendant was holding a knife during the chase. Meanwhile, King emerged from the house and started down the street. When defendant began to follow her, Cato ran for help to the home of defendant's brother, Richard Morgan (Rick), about a half mile away.
The two drove back to Ridge Street, where Cato saw a broken bottle in the street and King lying between two cars. Rick knocked on the door of Stacey Miller's home at 12 Ridge Street and asked him to call 911. Unable to comply because he did not have a telephone, Miller stepped outside to see what was happening. Defendant returned to the scene, carrying a knife. Miller saw defendant, Rick, and Cato standing together, engaged in conversation. Defendant said, "You-all are the reason why this happened to me," and chased Cato around the car shouting either "I'll kill you, too" or "I should have killed you." Someone called 911, and defendant walked away when police arrived at the scene.
Shortly before 2:00 a.m. on 26 November 1997, Sergeant Mike Hahn of the Asheville Police Department, driving a ChevroletBlazer, responded to a call requesting police assistance on Ridge Street. As Sergeant Hahn approached the scene, he observed a black male in dark clothing walking in the opposite direction. Sergeant Hahn then came upon a Chevrolet Monte Carlo parked on the wrong side of the road. He exited his vehicle and found King lying on her stomach with her shoulders and head under the rear of the Monte Carlo. Her jeans and underwear were pulled down and a sheet or curtain partially covered her body. The entire area behind the car was covered with blood and broken glass, although no knife was found at the scene. As Sergeant Hahn began to assess King's condition, he noticed Cato and Rick and heard Cato say, "You just drove right by him." EMS personnel arrived at the scene and King was transported to a nearby hospital, where doctors performed emergency surgery in an unsuccessful attempt to save her life.
Forest Weaver, a detective in the Criminal Investigations Division of the Asheville Police Department, went to Ridge Street around 9:00 a.m. on 26 November 1997. He found defendant hiding in the basement of 20 Ridge Street. Once defendant emerged, he was handcuffed and transported to the Asheville Police Department.
Willie Albert Jones, an inmate at the Buncombe County Jail, shared dormitory space in the jail with defendant. Jones testified that defendant told everyone in earshot about the murder, saying the victim used his drugs but would not give him sex. Defendant also wrote and sang a rap song about the murder. Jones recalled that the words of the song were "You shouldn'thave done what you done . . . smoke my rock, wouldn't give me none, you know, and I went and did what I did . . . I told you once, I told you twice, that you are going to have to pay the sacrifice . . . with your life." Another inmate, Eddie Oglesby, similarly testified that defendant sang about the killing and told Oglesby that he slashed the victim. According to Oglesby, defendant told him that the victim would not give him oral sex after smoking defendant's cocaine and that, in frustration, defendant hit the victim on the back of the head with a bottle and stabbed her.
Donald Jason, M.D., the forensic pathologist who performed the autopsy on King, testified that she suffered a total of forty-eight wounds to the face, head, back, buttocks, and upper back of her legs. Dr. Jason was of the opinion that King bled to death because of multiple stab and incised wounds caused by "a sharp object. These wounds are not consistent with typical knife wounds. They are all different sizes, shapes, irregular, fairly shallow. But some other type of sharp object such as something made out of glass that has a broken, sharp edge, or broken sharp edges of varying sizes and shapes."
Defendant testified on his own behalf and claimed that he acted in self-defense. According to defendant, he and King drank beer and smoked cocaine the evening of 25 November 1997. When Cato arrived later that evening, he gave defendant some crumbs of crack cocaine. King, who wanted more, began "screaming and hollering" when defendant declined to share the crumbs. Cato offered to let King use his pipe, and then both she and Catoasked defendant to buy more cocaine. Defendant refused because he wanted to save the rest of his money for his daughter. Defendant pulled his money out of his pocket and Cato snatched it away from him. When defendant attempted to retrieve it, King hit defendant over the shoulder with a beer bottle. As defendant turned to grab the bottle away from King, Cato approached defendant from behind and put him in a choke hold. Defendant hit Cato with the beer bottle in an unsuccessful attempt to free himself. Cato pulled a .25 automatic pistol from his pocket, placed it against defendant's head, and pulled the trigger. When the gun failed to fire, defendant reached for a knife that was on the table in front of him and Cato ran out the door. Defendant followed Cato and chased him around a car but could not catch him. Defendant stopped to catch his breath, and King hit him from behind with a beer bottle. The two began to fight in the middle of the street. According to defendant, "[King] would swing the bottle, I would swing the knife. It was rough." Defendant claimed that the incident had nothing to do with sex and denied that he ever sang a song about the murder while in custody.
PRETRIAL ISSUES
Defendant raises several issues pertaining to the pretrial proceedings in his case. Because two of the issues are intertwined, we address them together. First, defendant argues that the trial court erred in denying his motion to continue the pretrial hearing held pursuant to Rule 24 of the General Rules of Practice for the Superior and District Courts and in denying hismotion to continue his trial. Second, defendant contends the court improperly removed his second chair counsel, Carol Andres.
The record establishes that attorney Faye Burner was originally appointed to represent defendant. When the trial court was notified on 20 January 1998 that defendant would be tried capitally, Assistant Public Defender Calvin Hill was appointed to serve as co-counsel. On 10 March 1998, the trial court allowed motions to withdraw filed by both Hill and Burner and, to replace them, appointed attorney Stan Young as lead counsel and attorney Carol Andres as second chair counsel.
Defendant's Rule 24 hearing was set for 5 April 1999. Several weeks before the hearing, the State informed defendant of its intention to schedule the trial for 21 June 1999. On 1 April 1999, defendant filed a motion to continue the Rule 24 hearing and the trial. The motion stated that attorney Andres had recently undergone surgery to remove a pituitary tumor and would, in 30 days, begin five weeks of radiation therapy that could "cause some cognitive disruption that may affect [her] ability to engage in Defendant's serious and complicated case." During the 6 April 1999 hearing on that motion, lead counsel Young opposed appointment of a new second chair because attorney Andres had been involved in the case for over a year. Attorney Young asked the court instead to allow the motion to continue in anticipation that attorney Andres would be able to resume representation of defendant once the radiation regimen was completed. However, attorney Andres acknowledged that her treatment might result in short-term memory loss, which could cause additional issues toarise if the case had to be appealed. The court removed attorney Andres from the case and appointed attorney Bruce Elmore, Jr. as second chair. Because of the new appointment, the court recalendared the Rule 24 hearing for the following week and elected not to rule on the motion to continue the trial date.
On 13 April 1999, the rescheduled date for defendant's Rule 24 hearing, defendant filed a second motion to continue the hearing and to continue the trial until late September or October 1999. The motion was based on the complexities of the case, attorney Elmore's unfamiliarity with the file and facts, and possible scheduling conflicts arising from attorney Elmore's civil practice. Attorney Elmore, however, consented to proceeding with the Rule 24 hearing as scheduled, and the court thereafter denied defendant's motion to continue the trial.
On 4 June 1999, defendant filed a third motion to continue. This motion cited attorney Elmore's prior trial obligations, including a malpractice suit that had been set peremptorily for 23 August 1999; a trial involving attorney Young that had been set peremptorily for the week of 7 June 1999; the inability of defense experts to conduct a thorough examination of both defendant and any forensic evidence by the date set for trial; and the State's failure to provide timely discovery to defendant. After considering the arguments of counsel, the court denied this motion on 7 June 1999. Defendant's case was called for trial on 21 June 1999.
We first consider whether the trial court erred in denying defendant's motions to continue. Defendant contends thedenial of these motions violated his federal and state constitutional rights to effective assistance of counsel, to compulsory process, to confront his accusers, and to due process of law. Defendant claims the error was prejudicial because attorney Elmore did not have sufficient time to prepare an adequate defense.
We review a trial court's resolution of a motion to continue for abuse of discretion. State v. Searles, 304 N.C. 149, 153, 282 S.E.2d 430, 433 (1981).
When a motion to continue raises a constitutional issue, however, the trial court's ruling thereon involves a question of law that is fully reviewable on appeal by examination of the particular circumstances presented in the record. Even when the motion raises a constitutional issue, denial of the motion is grounds for a new trial only upon a showing that "the denial was erroneous and also that [defendant] was prejudiced as a result of the error." [State v.] Branch, 306 N.C. [101,] 104, 291 S.E.2d [653,] 656 [(1982)].
State v. Blakeney, 352 N.C. 287, 301-02, 531 S.E.2d 799, 811 (2000) (citations omitted) (first alteration in original), cert. denied, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001).
Prejudice due to ineffective assistance of counsel "is presumed ' without inquiry into the actual conduct of the trial' when ' the likelihood that any lawyer, even a fully competent one, could provide effective assistance' is remote." State v. Tunstall, 334 N.C. 320, 329, 432 S.E.2d 331, 336 (1993) (quoting United States v. Cronic, 466 U.S. 648, 659-60, 80 L. Ed. 2d 657, 668 (1984)). "'To establish a constitutional violation, a defendant must show that he did not have ample time to conferwith counsel and to investigate, prepare and present his defense.'" State v. Rogers, 352 N.C. 119, 125, 529 S.E.2d 671, 675 (2000) (quoting Tunstall, 334 N.C. at 329, 432 S.E.2d at 337).
While a defendant must be afforded a reasonable opportunity to prepare a defense, neither the United States Constitution nor the North Carolina Constitution guarantees a particular length of time for the preparation. The facts of each case are pertinent. For instance, in Rogers, a capital case, the defendant retained private counsel shortly after his first court appearance, then moved to dismiss that attorney one week before trial because he believed the attorney had not been preparing adequately and also may have had conflicting interests. The trial court allowed the motion, and the case was postponed for several weeks. However, the defendant was unable to retain other private counsel. With the rescheduled trial set to begin in thirty-four days, the court appointed lead counsel and, the next day, co-counsel. Once the defendant's newly appointed lawyers obtained the case file, they discovered that none of the witnesses had been interviewed. Nevertheless, despite two additional motions for a continuance, the trial was conducted as scheduled. On appeal, "[t]aking into account the unique factual circumstances" of that case, we held that the defendant had successfully established a presumption of ineffective assistance of counsel. Id. at 126, 529 S.E.2d at 676. This Court concluded that under the singular circumstances found in Rogers, it was unreasonable to think that any attorney could prepare adequatelyfor a complex bifurcated capital trial in thirty-four days when little or no advance trial preparation had been conducted. Id. at 125, 529 S.E.2d at 675-76.
Rogers is distinguishable from the case at bar. Here, the trial court appointed attorney Young as lead counsel for defendant on 10 March 1998. By the time attorney Elmore was appointed as second chair, attorney Young had already been involved in the case for over a year. By contrast, in Rogers, both of the newly-assigned attorneys had barely more than one month to become familiar with the case and prepare a defense. In addition, despite attorney Elmore's hectic professional schedule, the record demonstrates that he effectively participated in defendant's trial as second chair counsel. He filed numerous motions on defendant's behalf and met several times with the prosecutors while preparing a defense. During the guilt-innocence phase, attorney Elmore engaged in aggressive and informed cross-examination of several of the State's witnesses, conducted the direct examination of three out of the four defense witnesses, and gave defendant's final closing argument to the jury. After a careful review of the record, we are satisfied that attorneys Young and Elmore were given adequate time to prepare for the defense of this case. Defendant has not established that "he would have been better prepared had the continuance been granted." State v. Williams, 355 N.C. 501, 541, 565 S.E.2d 609, 632 (2002), cert. denied, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003). Defendant further claims that the trial court's denial of his motions to continue prevented his expert witness from conducting a thorough examination of a report of blood spatter (or, more formally, bloodstain patterns) that linked defendant to the crime. Defendant's clothes were seized at the time of his arrest in November 1997, and the State conducted blood spatter testing on the clothing. On 22 April 1999, defendant learned that preliminary blood spatter reports tied him to the murder. The State received its final report on this evidence on 28 April 1999, but did not provide a copy to defendant until 11 May 1999. Defendant's expert witness was unable to conduct her own examination until approximately one week before trial.
Defendant relies on State v. Barlowe, 157 N.C. App. 249, 578 S.E.2d 660, disc. rev. denied, 357 N.C. 462, 586 S.E.2d 100 (2003), in which the defendant was granted a new trial when the denial of her motion to continue precluded her from securing a blood spatter expert witness. In Barlowe, "the blood spatter evidence was critical to the State's case against defendant because it was the only physical evidence potentially placing [the defendant] at the scene at the time of the murder." Id. at 257, 578 S.E.2d at 665. We do not find Barlowe to be controlling. While the defendant in Barlowe was unable to obtain an expert in time for trial, defense counsel here stated at the 7 June 1999 motion hearing that he had retained an expert to review the State's blood spatter report. In addition, while the blood spatter evidence in Barlowe was key to proving the defendant's participation in the murder, in the case at bar, additionalcompelling evidence, including defendant's own statements, linked defendant to the murder.
Thus, defendant has failed to demonstrate he suffered material prejudice by the denial of his motions to continue. This assignment of error is overruled.
We next consider whether the trial court erred in removing attorney Andres as second chair counsel and substituting attorney Elmore in her stead. Defendant argues that he was deprived of his constitutional right to effective assistance of counsel because the trial court did not have justifiable grounds to remove attorney Andres on its own motion.
The decision to substitute counsel rests solely in the discretion of the trial court. State v. Robinson, 290 N.C. 56, 66, 224 S.E.2d 174, 180 (1976). Moreover, "[a] trial court is constitutionally required to appoint substitute counsel whenever representation by counsel originally appointed would amount to denial of defendant's right to effective assistance of counsel." State v. Thacker, 301 N.C. 348, 352, 271 S.E.2d 252, 255 (1980).
Defendant cites State v. Nelson, 76 N.C. App. 371, 333 S.E.2d 499 (1985), aff'd as modified, 316 N.C. 350, 341 S.E.2d 561 (1986), to support his argument. In Nelson, counsel was appointed to represent the defendant at his trial. Thereafter, the defendant's family, without seeking approval from the defendant, retained private counsel. The trial court ex mero motu removed the defendant's court-appointed counsel and substituted the retained attorney. However, the Court of Appeals observed that private counsel had been retained only to "assist"appointed counsel and that no evidence existed to suggest that the defendant had lost his status as an indigent entitled to court-appointed counsel under the federal and state constitutions. Id. at 373-74, 333 S.E.2d at 501. Therefore, the Court of Appeals held that no justifiable cause existed to warrant the termination of the satisfactory attorney-client relationship and ordered a new trial. Id. In affirming, this Court addressed only the issue of the timeliness of the defendant's notice that he would mount an insanity defense. Nelson, 316 N.C. at 354-56, 341 S.E.2d at 564-65.
Unlike Nelson, the record here establishes beyond a doubt that the trial court had reason to question attorney Andres' competency as an advocate at the time of defendant's trial and was justified in removing her as second chair counsel. During the 6 April 1999 pretrial hearing on defendant's motion to continue, attorney Andres informed the trial court of her recent brain surgery and pending radiation therapy. She reported that the radiation therapy might result in short-term memory loss that could "interfere with [her] ability to prepare a serious and detailed and intensive case." She also acknowledged that "we'll be setting it up for some reason to appeal it if it turned out that I did have some sort of memory loss." In response, the trial court stated:
[I]n view of those circumstances I think the prudent thing to do would be to remove you from any further responsibility in this case. If anything, it may cause to complicate your own physical well[-]being by having to concern yourselves and worry yourself with it. I think that justice would require thatwe relieve you of any further responsibility . . . .
After removing attorney Andres, the trial court appointed attorney Elmore.
We are satisfied that the trial court, faced with the prospect of having an impaired or incapacitated second chair counsel representing defendant in a capital trial, reasonably understood that it was constitutionally required to remove attorney Andres. Realizing that attorney Andres' current medical condition could affect her ability to provide competent legal assistance and thereby interfere with defendant's constitutional right to effective assistance of counsel, the trial court justifiably and properly removed her. This assignment of error is overruled.
Defendant next claims that the short-form indictment used to charge him violated his federal and state constitutional rights because it failed to allege every element of the offense and the aggravating circumstances on which the State intended to rely at sentencing. Citing Ring v. Arizona, 536 U.S. 584, 153 L. Ed. 2d 556 (2002), defendant argues that aggravating circumstances are elements of first-degree capital murder that must be included in the indictment and proved beyond a reasonable doubt. However, this Court has consistently held that the short-form indictment is sufficient to charge first-degree capital murder without the inclusion of aggravating circumstances. See State v. Hunt, 357 N.C. 257, 278, 582 S.E.2d 593, 607, cert. denied, 539 U.S. 985, 156 L. Ed. 2d 702 (2003). This assignment of error is overruled.
JURY SELECTION ISSUES
Defendant argues that the trial court erred by refusing to excuse for cause prospective jurors May Trantham and Kevin Cutshaw. Defendant contends that each indicated during voir dire an intent always to vote for death upon finding first-degree murder.
We begin by considering the statutory requirements for preserving such a challenge. A trial court's refusal to grant a challenge for cause is reversible on appeal only when a defendant has: "(1) Exhausted the peremptory challenges available to him; (2) Renewed his challenge as provided in subsection (i) of this section; and (3) Had his renewal motion denied as to the juror in question." N.C.G.S. § 15A-1214(h) (2003). This "statutory method for preserving a defendant's right to seek appellate relief when a trial court refuses to allow a challenge for cause is mandatory and is the only method by which such rulings may be preserved for appellate review." State v. Sanders, 317 N.C. 602, 608, 346 S.E.2d 451, 456 (1986).
Here, the record reveals that defendant failed to comply with this statutory requirement. Following questioning by defense counsel of prospective juror Trantham, the trial court denied defendant's challenge for cause. Consequently, defendant peremptorily struck this prospective juror. Later, after defendant exhausted his peremptory challenges, the trial court denied his motion to excuse prospective juror Cutshaw for cause. Defendant, however, never renewed his challenge for cause as to either prospective juror Trantham, as required by N.C.G.S. § 15A-1214(h)(2), or to prospective juror Cutshaw, as required by id. § 15A-1214 (i)(2). See Sanders, 317 N.C. at 607-08, 346 S.E.2d at 455-56; State v. Johnson, 317 N.C. 417, 432-33, 347 S.E.2d 7, 16-17 (1986).
Even if defendant had complied with statutory procedures, he would not be entitled to relief. A prospective juror can be challenged for cause when he or she "[a]s a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina." N.C.G.S. § 15A-1212(8) (2003). However, excusal of a prospective juror for cause is not mandatory when he or she is able to disregard any personal convictions, follow the laws of the state as provided by the trial court, and render a fair and impartial verdict based on the evidence. State v. Jaynes, 342 N.C. 249, 270-71, 464 S.E.2d 448, 461 (1995) (citing State v. Green, 336 N.C. 142, 166-67, 443 S.E.2d 14, 28-29, cert. denied, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994)), cert. denied, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996).
The decision "'[w]hether to allow a challenge for cause in jury selection is . . . ordinarily left to the sound discretion of the trial court which will not be reversed on appeal except for abuse of discretion.'" State v. Stephens, 347 N.C. 352, 365, 493 S.E.2d 435, 443 (1997) (quoting State v. Locklear, 331 N.C. 239, 247, 415 S.E.2d 726, 731 (1992)), cert. denied, 525 U.S. 831, 142 L. Ed. 2d 66 (1998). An appellate court should affirm a discretionary decision by the trial court that is supported by the record, Wainwright v. Witt, 469 U.S.412, 434, 83 L. Ed. 2d 841, 858 (1985), and reverse only where the decision is "'manifestly unsupported by reason'" and "' so arbitrary that it could not have been the result of a reasoned decision.'" State v. T.D.R., 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998) (quoting White v. White, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985)). Our review of the record satisfies us that the trial court did not abuse its discretion here.
When prospective juror Trantham was questioned by defense counsel, the following exchange ensued:
Q. Can you think of any circumstance . . . under which you could give life rather than death? . . .
A. That I would give life instead of death?
Q. Yes, ma'am. Once you found First Degree Murder, aggravation, no mitigation.
A. No.
Defense counsel later questioned prospective juror Cutshaw regarding his views on the death penalty. He responded as follows:
Q. You will have found unanimously and beyond a reasonable doubt that one or more of these 11 aggravators exist, and you also will have found that no mitigating factors exist, or that the mitigating factors are not sufficient to outweigh the aggravating factors. At that point, would death be automatic to you?
A. Only after - Yes, it would.
Defendant contends that these responses by prospective jurors Trantham and Cutshaw impart a "definite impression that [they] would be unable to faithfully and impartially apply the law," Wainwright, 469 U.S. at 426, 83 L. Ed. 2d at 852, requiringtheir excusal for cause. However, further questioning of both prospective jurors revealed that neither would automatically impose the death penalty regardless of the circumstances or the law. After giving the responses quoted above, prospective juror Trantham was asked additional questions by defense counsel:
Q. Ma'am, you have found First Degree Murder and aggravating factors and mitigating, but they don't outweigh the aggravating factor[s], could you then seriously consider the imposition of a life sentence?
A. Yes, I would abide by what the law said.
Additional questioning of prospective juror Cutshaw by defense counsel revealed that he too would consider the imposition of a life sentence:
Q. Well, is there anything that you can think of right now that Mr. Young or I could say or present to you at that point, assuming you have found First Degree Murder, aggravators and no mitigators or that the aggravators outweigh the mitigators, is there anything that we can do to convince you to give a sentence of life without parole rather than death?
A. I would just have to hear the whole case. You know, I can't - I can't answer that right now.
. . . .
Q. Are your feelings about murder so strong that your ability to seriously consider a sentence of life in prison without parole rather than death by execution would be substantially impaired?
A. No, sir.
Q. Again, I guess my final question to you, I know you are going to go through these four steps as the law requires, each box has to be filled in. Would it just be going through the steps or going through the motions, orwill you seriously consider all of these factors, including mitigating circumstances?
A. I would have to hear all of the factors.
Thus, both of these prospective jurors affirmed that they could set aside their personal opinions and reach a decision based on the law. Where a prospective juror initially expresses a belief that every convicted first-degree murderer should receive the death penalty, but later indicates he or she would follow the trial court's instructions with respect to recommending the appropriate sentence, a trial court's denial of a challenge for cause is not error. State v. Walls, 342 N.C. 1, 35, 463 S.E.2d 738, 754-55 (1995), cert. denied, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996). The responses here were sufficient to support the decision by the trial court to deny the challenges for cause. See State v. Rogers, 355 N.C. 420, 430, 562 S.E.2d 859, 867 (2002) ("A judge who observes the prospective juror's demeanor as he or she responds to questions and efforts at rehabilitation is best able to determine whether the juror should be excused for cause."). Therefore, the trial court did not err in denying the challenges for cause. This assignment of error is overruled.
Next, defendant argues that the trial court improperly excused for cause thirty-six prospective jurors who expressed reservations about imposing the death penalty. Citing Witherspoon v. Illinois, defendant claims that none of the thirty-six prospective jurors were "irrevocably committed . . . to vote against the penalty of death regardless of the facts and circumstances." 391 U.S. 510, 522 n.21, 20 L. Ed. 2d 776, 785n.21 (1968). He contends that the entire voir dire examination of each prospective juror indicates an ability to consider and impose the appropriate punishment, including death.
"[M]ere opposition to the death penalty does not disqualify a prospective juror if the juror can set aside his or her personal beliefs and follow the law." State v. Berry, 356 N.C. 490, 502, 573 S.E.2d 132, 141 (2002). The test is whether the views of a prospective juror on capital punishment "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright, 469 U.S. at 424, 83 L. Ed. 2d at 851-52 (quoting Adams v. Texas, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)).
We have reviewed the record and transcript pertinent to each of these thirty-six prospective jurors. As to one prospective juror named by defendant, Thomas Morgan, our review indicates that he was excused because he was a reporter who was familiar with the case and whose professional responsibilities made him uncomfortable with the idea of serving as a juror. However, we have also considered the voir dire of another prospective juror, Robin Harwell, who was being questioned along with prospective juror Morgan and was excused for cause as being opposed to the death penalty. In addition, while defendant names prospective juror Sharon Norton in this assignment of error, the transcript pages cited by defendant contain the voir dire examination of prospective juror Shannon Fox, who was excused for cause. Accordingly, we have also considered the responses given by prospective juror Fox. Our review reveals that each of the thirty-six prospective jurors involved in this assignment of error stated during voir dire that he or she possessed views on capital punishment that would "substantially impair" his or her ability to render a verdict in accordance with the law. For example, the prosecutor questioned prospective juror Johanna Hensley about her religious and personal beliefs with respect to the death penalty. After she indicated that she has held a strong opposition to the death penalty since childhood, the following exchange took place:
Q. Would you say that it's true that nothing I presented by way of aggravating circumstances would get you to change your beliefs?
A. Well, I can differentiate, but it's going to make me sick to think - I mean, it's going to make me feel bad. I can follow the law and do what you say I should do, but it's going to make me personally feel upset. So, no, I can't. No, I cannot -
Q. You would -
A. - render death.
Q. So no matter what I presented, you could not do that?
A. No.
Q. So would you indicate or state that your strong personal and religious beliefs would substantially impair your ability to render a verdict of death in this case?
A. Yes.
[PROSECUTOR]: The State moves for cause in Ms. Hensley's case.
[DEFENSE COUNSEL]: Objection.
THE COURT: Overruled.
Virtually identical responses were elicited from each of the other prospective jurors named by defendant. Each expressed an inability to impose the death penalty regardless of the facts and circumstances. Accordingly, the trial court did not abuse its discretion in excusing for cause these thirty-six prospective jurors. This assignment of error is overruled.
GUILT-INNOCENCE ISSUES
Kenneth Cato was unavailable because he died before defendant's trial. Defendant contends that the trial court erroneously admitted three of Cato's out-of-court statements.
First, the trial court admitted Cato's statement to Rick Morgan. The evidence indicated that Cato arrived at Rick's house at approximately 1:30 a.m. on 26 November 1997. Rick testified that Cato said "he [Cato] wanted me to come with him, my brother was tripping."
Second, Sergeant Douglas Berner of the Asheville Police Department testified that he interviewed Cato at approximately 3:30 a.m. on 26 November 1997. At trial, over defendant's objection, Berner read aloud the notes he had taken from his interview of Cato. He related to the jury that Cato described how he had arrived home to find defendant and King apparently smoking crack, that King had refused to give defendant a "head job," that defendant slapped King and threatened Cato with a beer bottle, that Cato and defendant had fought, that defendant hit Cato with a beer bottle and chased him outside while wielding a knife, that defendant began to follow King, that Cato ran to Rick Morgan's house, then returned and saw King lying in the street,and that defendant, still carrying a knife, chased Cato again, shouting "I should have killed you."
Third, Cato also spoke with Detective Kevin Taylor of the Asheville Police Department. At a pretrial suppression hearing, the State agreed not to elicit from Detective Taylor any of Cato's statements to him, and no questions about the statements were asked during Detective Taylor's direct testimony at trial. However, during defense counsel's cross-examination of Detective Taylor, in an apparent effort to impeach Cato based on inconsistencies in his statements, counsel asked Detective Taylor whether he had interviewed Cato after the murder. In response, Detective Taylor testified that he attended part of the interview that Sergeant Berner conducted with Cato in which Cato told Sergeant Berner that defendant came out of the house with a knife and that defendant also hit him with a beer bottle. Detective Taylor provided additional cross-examination testimony to the effect that he conducted another interview with Cato, during which Cato said that King was carrying a beer bottle when she came out of the house. Detective Taylor also related that he took custody of Cato's overalls and jacket to have them tested for blood.
The trial court admitted all three statements pursuant to Rules 803(1) and 803(2) of the North Carolina Rules of Evidence, which respectively designate present sense impressions and excited utterances as hearsay exceptions. Defendant argues in his original brief that these statements did not fit within either exception and, therefore, were inadmissible hearsay underRule 802. However, the case was tried and defendant's initial brief to this Court was filed before the United States Supreme Court issued its opinion in Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177 (2004). In that case, the Supreme Court held that the Confrontation Clause bars the admission of out-of-court testimonial statements unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him or her. Id. at ___, 158 L. Ed. 2d at 203. Because defendant had entered notice of appeal and his case was pending when Crawford was issued, that decision applies to defendant's case. Griffith v. Kentucky, 479 U.S. 314, 322-23, 93 L. Ed. 2d 649, 658 (1987). Accordingly, defendant filed a supplemental brief in which he argues that the admission of Cato's statements to Sergeant Berner and Detective Taylor violated his constitutional rights, as set out in Crawford.
We begin by considering the admissibility of Cato's statement to Rick Morgan. Because defendant does not argue that Crawford applies to this statement, our analysis focuses on whether it was properly admitted as a hearsay exception.
Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (2003). As a general rule, hearsay is inadmissible at trial. Id. Rule 802 (2003). Rules 803 and 804, however, provide exceptions and permit the admission of hearsay statements under certain circumstances. As to the specific exceptions invoked by the trial court in the case at bar, Rule 803(1) provides for the admissibility of present sense impressions. A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Id. Rule 803(1) (2003). "The basis of the present sense impression exception is that closeness in time between the event and the declarant's statement reduces the likelihood of deliberate or conscious misrepresentation." State v. Pickens, 346 N.C. 628, 644, 488 S.E.2d 162, 171 (1997); see also State v. Reid, 322 N.C. 309, 315, 367 S.E.2d 672, 675 (1988). In addition, Rule 803(2) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by Rule 802. N.C.G.S. § 8C-1, Rule 803(2) (2003). For a statement to fall under this excited utterance exception, "'there must be (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication.'" State v. Maness, 321 N.C. 454, 459, 364 S.E.2d 349, 351 (1988) (quoting State v. Smith, 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985)).
Evidence presented at trial established that after wrestling with defendant at 13 Ridge Street, Cato fled to Rick's house, seeking help. Rick testified that Cato woke him up and explained that he needed help because defendant was "tripping." This statement, made to explain or describe a conditionimmediately after the declarant perceived the condition, is a typical example of a present sense impression. Maness, 321 N.C. at 458-59, 364 S.E.2d at 351. Although there is no per se definition of "immediately thereafter," prior holdings of this Court indicate that a brief lapse in time does not disqualify a statement from falling under Rule 803(1). See Pickens, 346 N.C. at 644-45, 488 S.E.2d at 171 (statements identifying the defendant as the person who shot the victim were made while perceiving the event, or immediately thereafter, because there was evidence that the defendant was still in the process of leaving the scene of the crime with a gun in hand when the statements were made); State v. Cummings, 326 N.C. 298, 314, 389 S.E.2d 66, 75 (1990) (statement made after having driven from Willow Springs to Raleigh was held sufficiently close to the event to be admissible); State v. Odom, 316 N.C. 306, 313, 341 S.E.2d 332, 336 (1986) (statement by an eyewitness to police, who arrived at the scene ten minutes after the event, is admissible as a present sense impression). Here, the lapse in time between defendant's behavior and Cato's description to Rick was the time it took to for him to reach Rick's house, just half a mile away. The likelihood that this time afforded Cato an opportunity deliberately to misrepresent defendant's condition is remote. Therefore, we conclude that Cato's statement was made sufficiently close to the event and was admissible as a present sense impression under Rule 803(1). Accordingly, we need not address whether this statement was also admissible as an excited utterance. Next, we address the statements Cato made to Sergeant Berner and Detective Taylor. As detailed above, Detective Taylor testified about his interviews with Cato only when asked by defense counsel during cross-examination. Because defendant elicited Detective Taylor's testimony, he cannot object to its admission. N.C.G.S. § 15A-1443(c) (2003); State v. Mitchell, 342 N.C. 797, 806, 467 S.E.2d 416, 421 (1996). Consequently, defendant's argument that this evidence was inadmissible under Crawford fails.
We now turn to Cato's statements admitted through Sergeant Berner. Defendant contends that the trial court violated his constitutional right to confrontation because he never had an opportunity to cross-examine Cato. We agree that Cato's statement to Sergeant Berner was testimonial in nature because it was "knowingly given in response to structured police questioning." Crawford, 541 U.S. at ___ n.4, 158 L. Ed. 2d at 194 n.4. The record further reveals that defendant was never afforded a chance to cross-examine Cato regarding this statement. As a result, Cato's statement to Sergeant Berner was admitted in violation of defendant's Sixth Amendment right to confront his accuser.
However, a constitutional violation does not necessarily result in a new trial. "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt." N.C.G.S. § 15A-1443(b) (2003). The State bears the burden of proving the error was harmless. Id. "[T]he presence of overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt." State v. Autry, 321 N.C. 392, 400, 364 S.E.2d 341, 346 (1988).
Defendant argues that he was prejudiced by the admission of this statement because it contradicted his testimony and undermined his contention that he acted in self-defense. Although defendant concedes there was ample evidence that he killed King, including his own testimony, he asserts that the State presented no evidence that the killing was premeditated or deliberate. Therefore, according to defendant, it is possible that, had Cato's statement to Sergeant Berner not been admitted, the jury could have returned a lesser verdict of second-degree murder or voluntary manslaughter.
After a review of the entire record in this case, we conclude that the erroneous admission of this testimony by the trial court was harmless in light of other overwhelming evidence that was properly admitted to establish defendant's guilt of first-degree murder, including blood spatter evidence, the broken bottle on the street beside King's body, the forty-eight wounds inflicted on King, see State v. Skipper, 337 N.C. 1, 35, 446 S.E.2d 252, 271 (1994) ("nature and number of the wounds and evidence that the murder[] w[as] done in a brutal manner are circumstances from which premeditation and deliberation can be inferred"), cert. denied, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995), Stacey Miller's testimony that defendant chased Cato while yelling, "I'll kill you, too," and the testimony of inmatesJones and Oglesby that defendant composed and sang a rap song in which he said that King paid with her life for smoking defendant's crack and denying him sex. Accordingly, we are satisfied that the error in the admission of Cato's hearsay statement to Sergeant Berner was harmless beyond a reasonable doubt. See also Bell v. State, 278 Ga. 69, 71-72, 597 S.E.2d 350, 353 (2004); Cassidy v. State, ___ S.W.3d ___, 2004 Tex. App. LEXIS 4519, at *10-11 (May 20, 2004) No. 03-03-00098-CR, disc. rev. refused, 2004 Tex. Crim. App. LEXIS 1720 (Oct. 13, 2004). This assignment of error is overruled.
In defendant's next assignment of error, he argues that the trial court erred in denying his motion to exclude evidence of two prior assaults he committed against Abraham Adams in 1992. The trial court admitted this evidence pursuant to Rule 404(b) of the North Carolina Rules of Evidence. Defendant contends that the evidence was irrelevant and was presented only to establish his bad character.
On voir dire, Adams testified that he had promised to give defendant a dollar in exchange for a ride. A few days later, on 28 July 1992, defendant demanded the dollar and threatened to jump on Adams if he did not pay up. Adams declined to pay and entered a nearby cafe. When Adams exited, defendant attacked him, then grabbed a beer bottle off a ledge and used it to hit Adams on the side of the head. Adams fell and defendant continued to kick him and hit him on the head with the bottle. The fight was eventually broken up by onlookers. The second assault occurred on 29 December 1992, when defendant againattacked Adams. As the two walked toward each other, defendant knocked Adams to the ground, and jumped on top of him. Defendant hit Adams, then grabbed trash from a nearby pile and began beating Adams with it. Although Adams could not recall just what defendant hit him with during the second fight, he knew there were bottles in the trash and that he was cut by glass. Defendant was charged with assault with a deadly weapon with intent to kill inflicting serious injury and with assault with a deadly weapon. At the conclusion of the voir dire, the trial court ruled that evidence of these assaults was admissible pursuant to Rule 404(b) to show proof of motive, opportunity, intent, identity, or absence of mistake. When Adams later testified before the jury, the trial court gave a limiting instruction.
Rule of Evidence 404(b) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.
N.C.G.S. § 8C-1, Rule 404(b) (2003). Pursuant to this rule, evidence of prior bad acts is generally admissible if it tends to prove any relevant fact other than the defendant's propensity to commit the offense, Berry, 356 N.C. at 505, 573 S.E.2d at 143, unless the probative value of the evidence is substantially outweighed by its prejudicial effect, N.C.G.S. § 8C-1, Rule 403 (2003). See State v. Artis, 325 N.C. 278, 299-300, 384 S.E.2d 470, 481-82 (1989) (relevant prior incidents must be sufficientlysimilar and not so remote in time so as to run afoul of the balancing test set forth in Rule 403), judgment vacated on other grounds, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).
The State advised the trial court that it was tendering evidence of defendant's two prior assaults on Adams under Rule 404(b) for the purpose of proving the identity of King's assailant. Defendant asserts that this evidence was irrelevant because identity was not an issue. He admitted that he was responsible for King's death, and witnesses put him at the scene. However, defendant pled not guilty. State v. Perry, 275 N.C. 565, 570, 169 S.E.2d 839, 843 (1969) (defendant's plea of not guilty placed in issue every material allegation contained in the indictment, including his identity as the perpetrator). He did not make any pretrial statement and did not admit his involvement until he testified in his own defense at trial, after the State had presented its case-in-chief. In addition, defendant's cross-examination on several occasions insinuated that Cato was at least involved in the murder. As a result, we are unwilling to conclude that the identity of the perpetrator of the murder was not an issue at the time of Adams' testimony.
Moreover, even if the evidence were inadmissible to establish identity, defendant has failed to demonstrate prejudice. To establish prejudicial error, a defendant must show there was a reasonable possibility that a different result would have been reached had the evidence been excluded. N.C.G.S. § 15A-1443(a). Although the State offered the evidence specifically to show identity, the trial court admitted it forthe multiple purposes of showing proof of motive, opportunity, intent, identity, or absence of mistake. "[W]here at least one of the [other] purposes for which the prior act evidence was admitted was [proper,]" there is no prejudicial error. State v. Haskins, 104 N.C. App. 675, 683, 411 S.E.2d 376, 382 (1991), disc. rev. denied, 331 N.C. 287, 417 S.E.2d 256 (1992). See also State v. Bagley, 321 N.C. 201, 206, 362 S.E.2d 244, 247 (1987) (even though testimony was inadmissible to show identity of the perpetrator, it was admissible for other purposes provided in Rule 404(b)), cert. denied, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).
One of the other purposes for which the trial court admitted the prior crime evidence was to prove intent. Intent is an element of first-degree murder, and evidence of prior crimes that tends to establish a particular mental state may be admitted into evidence. See State v. Jones, 353 N.C. 159, 172-73, 538 S.E.2d 917, 928 (2000) (evidence of pending charges admissible under 404(b) to establish element of malice); State v. Rich, 351 N.C. 386, 400, 527 S.E.2d 299, 306-07 (2000) (same result as to evidence of prior convictions). In his first assault against Adams, defendant beat him with a beer bottle. The bottle broke when defendant struck the left side of Adams' head, causing shards of glass to lodge in Adams' skin. In the second attack, Adams' clothes were cut as a result of defendant's hitting him with items found in a nearby trash pile that included cans and bottles. In the murder at bar, the forensic pathologist who performed the autopsy of King testified that she suffered forty-eight wounds caused by a "sharp object such as something made out of glass that has a broken, sharp edge." The evidence of defendant's attacks on Adams demonstrates that defendant was aware that the act of striking another individual with a beer bottle was a reckless and dangerous act that could cause serious injury. The trial court properly admitted this evidence under Rule 404(b) to show intent. This assignment of error is overruled.
Defendant next argues that the trial court erred in qualifying State Bureau of Investigation Special Agent Mike Garrett as an expert in bloodstain pattern interpretation and in admitting his expert testimony. Defendant, relying upon State v. Goode, 341 N.C. 513, 461 S.E.2d 631 (1995), and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469 (1993), contends that Agent Garrett's testimony was inherently unreliable because he lacked the requisite knowledge and credentials to permit his qualification as an expert.
Defendant filed his brief before we issued our opinion in Howerton v. Arai Helmet, Ltd., 358 N.C. 440, 597 S.E.2d 674 (2004). In Howerton, we addressed the admissibility of expert testimony and concluded that North Carolina is not a Daubert state. Id. at 469, 597 S.E.2d at 693. This Court was concerned about the excessively mechanical application of the Daubert factors that seem to have evolved in the federal courts. Id. at 464-66, 597 S.E.2d at 690-91. We were also uneasy about the potential interpretations and applications of Daubert that could strip the jury of its function as the ultimate finder of fact. Id. at 468, 597 S.E.2d at 692. Accordingly, we reiterated that under North Carolina law, a trial court that is considering whether to admit proffered expert testimony pursuant to North Carolina Rule of Evidence 702 must conduct a three-step inquiry to determine: (1) whether the expert's proffered method of proof is reliable, (2) whether the witness presenting the evidence qualifies as an expert in that area, and (3) whether the evidence is relevant. Id. at 458, 597 S.E.2d at 686 (citing Goode, 341 N.C. at 527-29, 461 S.E.2d at 639-41). In discussing the trial court's determination of the reliability of proffered expert evidence where "the trial court is without precedential guidance or faced with novel scientific theories, unestablished techniques, or compelling new perspectives on otherwise settled theories or techniques," we set out several "indices of reliability" that the trial court could consider. Id. at 460, 597 S.E.2d at 687 (citing State v. Pennington, 327 N.C. 89, 393 S.E.2d 847 (1990)). Because we did not intend to tie the hands of the State's able trial bench, we specifically stated that these indices were not exclusive. Id. A trial court is "afforded 'wide latitude of discretion when making a determination about the admissibility of expert testimony.'" Id. at 458, 597 S.E.2d at 686 (quoting State v. Bullard, 312 N.C. 129, 140, 322 S.E.2d 370, 376 (1984)). Accordingly, a trial court's rulings under Rule 702 will not be reversed on appeal absent an abuse of discretion. Id.
Turning to the case at bar, defendant does not contend that bloodstain pattern interpretation is not a sufficientlyreliable area for expert testimony, and at any rate we have recognized this discipline to be "an appropriate area for expert testimony." Goode, 341 N.C. at 531, 461 S.E.2d at 641. In addition, defendant does not argue that the evidence is irrelevant. Defendant's contention is that Agent Garrett was not qualified in the field of bloodstain pattern interpretation. Accordingly, we will limit our analysis to this issue.
We have held that
"[i]t is not necessary that an expert be experienced with the identical subject matter at issue or be a specialist, licensed, or even engaged in a specific profession. It is enough that the expert witness 'because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.'"
Id. at 529, 461 S.E.2d at 640 (citations omitted). The record reveals that Agent Garrett possessed sufficient knowledge, experience, and training in the field of bloodstain pattern interpretation to warrant his qualification as an expert in that field. Agent Garrett testified that he had completed two training sessions on bloodstain pattern interpretation, had analyzed bloodstain patterns in dozens of cases, and had previously testified in a homicide case as a bloodstain pattern interpretation expert. In addition, Agent Garrett described in detail to the judge and jury the difference between blood spatter and transfer stains and produced visual aids to illustrate his testimony.
Based on this testimony, the trial court reasonably could have determined that Agent Garrett was in a better position to have an opinion on bloodstain pattern interpretation than thetrier of fact. There is more than one road to expertise that assists a jury in understanding the evidence or determining a fact at issue, and Agent Garrett's qualifications are not diminished, as defendant suggests, by the fact that he has never written an article, lectured, or taken a college-level course on bloodstain or blood spatter analysis. The trial court did not abuse its discretion in qualifying Agent Garrett as an expert. This assignment of error is overruled.
Defendant next contends that the trial court erred in denying his motion to dismiss the first-degree murder charge. At the close of the State's case-in-chief, defendant moved to dismiss for insufficiency of the evidence. The motion was denied. Defendant asserts this ruling was erroneous because the evidence failed to establish that he acted with deliberation.
When considering a motion to dismiss, the trial court must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. State v. Gladden, 315 N.C. 398, 430, 340 S.E.2d 673, 693, cert. denied, 479 U.S. 871, 93 L. Ed. 2d 166 (1986). If substantial evidence exists to support each essential element of the crime charged and that defendant was the perpetrator, it is proper for the trial court to deny the motion. State v. Malloy, 309 N.C. 176, 178, 305 S.E.2d 718, 720 (1983).
Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead, they usually must be proved by circumstantial evidence. Among other circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) wantof provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner. We have also held that the nature and number of the victim's wounds are circumstances from which premeditation and deliberation can be inferred.
Gladden, 315 N.C. at 430-31, 340 S.E.2d at 693 (citations omitted).
Here, sufficient evidence was presented at trial to prove the killing was carried out deliberately. Defendant inflicted numerous stab and slash injuries to the victim over a period of time. According to the pathologist who performed the autopsy, several of the victim's bones were broken, indicating that some of the blows were delivered with great force. In addition, defendant partially disrobed the victim during the assault and later returned to the scene and threatened to kill Cato while brandishing a knife. Accordingly, the trial court properly denied defendant's motion to dismiss. This assignment of error is overruled.
Defendant assigns error to several of the trial court's instructions that were delivered at the conclusion of the guilt phase of the trial. He contends that the trial court's instructions impermissibly: (1) placed the burden of proof on defendant to satisfy the jury that his evidence was believable beyond a reasonable doubt; (2) required that the jurorsunanimously believe the evidence beyond a reasonable doubt; and (3) instructed the jury that it must be "simply satisfied" with defendant's evidence for it to be believed. Defendant claims that the instructions violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 23, and 27 of the North Carolina Constitution. In addition, defendant claims that his trial counsel's failure to object to these instructions constituted ineffective assistance of counsel.
Rule (10)(b)(2) of the North Carolina Rules of Appellate Procedure states that "[a] party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict." N.C. R. App. P. 10(b)(2). Because defendant concedes that he did not object to any portion of the trial court's instructions, our review of these contentions is limited to plain error. See id. 10(c)(4). Plain error is applied only in exceptional cases where a review of the entire record establishes that the erroneous instructions probably had an effect on the jury's finding of guilt. State v. Odom, 307 N.C. 655, 660-61, 300 S.E.2d 375, 378-79 (1983). See also State v. Jones, 355 N.C. 117, 125, 558 S.E.2d 97, 103 (2002).
A charge must be construed contextually, and isolated portions of it will not be held prejudicial when the charge as a whole is correct. If the charge as a whole presents the law fairly and clearly to the jury, the fact that isolated expressions, standing alone, might be considered erroneous will afford no ground for a reversal. Furthermore, insubstantial technical errors which could not have affected the result willnot be held prejudicial. The judge's words may not be detached from the context and the incidents of the trial and then critically examined for an interpretation from which erroneous expressions may be inferred.
State v. McWilliams, 277 N.C. 680, 684-85, 178 S.E.2d 476, 479 (1971) (citations omitted).
We first address defendant's argument that the instructions impermissibly placed the burden of proof on him. Defendant takes exception to the following portion of the jury charge:
In order to resolve whatever conflicts that exist in the testimony, in order to decide what evidence is of some degree of more importance than is some other aspect of the evidence, the jury under the law is empowered to do two things with regard to the evidence.
First of all, decide what credibility you're going to give the witnesses that testified in this case. And then once you decide the evidence is believable to the extent of beyond a reasonable doubt in accordance with what the State must prove, then decide what evidence is more important or of less importance to you as to some other aspect you deem to be believable.
(Emphasis added.) Defendant contends that because this portion of the instructions made no distinction between the State's evidence and defendant's evidence, he was saddled with the burden of proving to the jury that his evidence was believable beyond a reasonable doubt. Defendant's contention is without merit. Although the quoted portion of the instruction is awkwardly phrased, it advises the jury that the State has the burden of proving its evidence beyond a reasonable doubt. We do not interpret this instruction as shifting any burden to defendant. Moreover, the trial court unquestionably instructed the jurycorrectly elsewhere as to the burden of proof. Just before giving the instruction quoted above, the trial court advised the jury: "[Defendant] is presumed to be innocent. He has no burden to prove his innocence. The burden is upon the State, the party that has charged him, to satisfy you of his guilt to the crime charged or some lesser offense from the evidence . . . to the extent of beyond a reasonable doubt." In addition, after giving the instruction to which defendant objects, the trial court on several other occasions instructed the jury that the State bore the burden of proving its case beyond a reasonable doubt. When viewed in context, we are satisfied that the jury understood that defendant did not bear the burden of proof in this case.
We next address defendant's contention that the trial court's instructions erroneously required the jurors unanimously to decide what evidence to believe beyond a reasonable doubt. The trial court instructed the jury as follows:
During the course of your deliberations, after recalling each witness's testimony, which it is your duty to do, decide for yourselves collectively and unanimously what you're going to see fit to believe to the extent of beyond a reasonable doubt in accordance with what the State must prove. And then from that, you find the facts, and then apply the law to those facts.
(Emphasis added.) Defendant argues that this instruction deprived the jurors of their right individually to assess witness credibility and to decide what evidence was believable in determining whether the State met its burden. Although defendant relies on McKoy v. North Carolina, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), to support his argument, that case isdistinguishable. In McKoy, the United States Supreme Court invalidated North Carolina's requirement that a sentencing jury unanimously find the existence of mitigating circumstances. 494 U.S. at 444, 108 L. Ed. 2d at 381. Because the alleged error in the case at bar occurred during the guilt phase of trial, not the sentencing phase, the holding in McKoy is not implicated.
We do not believe that this instruction suggested that individual jurors should "surrender their own convictions." State v. Ward, 301 N.C. 469, 478, 272 S.E.2d 84, 90 (1980). While the wording of the instruction is infelicitous, we read it as restating both that the State bore the burden of proving every element of the offense beyond a reasonable doubt and that the jury must believe beyond a reasonable doubt that each element had been proven before it could convict. See N.C. Const. art. I, § 24 ("No person shall be convicted of any crime but by the unanimous verdict of a jury . . . .").
Defendant also argues that the trial court impermissibly instructed the jury that it must be "simply satisfied" with defendant's evidence in order for it to be believed. The trial court instructed as follows:
There are three things, and three things only, that you use to come to whatever conclusion you come to in this case; the testimony from the mouths of the witnesses after they took some kind of oath, that is, as much of that testimony as you deem to be believable to the extent of beyond a reasonable doubt. And I'll remind you that the Defendant does not have to prove anything to the extent of beyond a reasonable doubt. In order to believe his evidence, you must be just simply satisfied. The State has the burden of proving to you its evidence to the extent of beyond a reasonable doubt.
(Emphasis added.) This Court addressed a similar issue in State v. Roache, where the trial court instructed the jury that "it must be 'simply satisfied' with defendant's evidence in order to find it believable." 358 N.C. 243, 302-03, 595 S.E.2d 381, 419 (2004). Unlike the case at bar, the defendant in Roache objected in time for the trial court to give a clarifying instruction the next day. We found no error in Roache because
the trial court properly charged the jury as to the burden of proof at two separate points in the jury charge by specifically stating that defendant had no burden of proof and also that the jury was to decide the case using "as much of th[e] evidence as you see fit to believe, to the extent of beyond a reasonable doubt in accordance with what the State must prove."
Id. at 303, 595 S.E.2d at 419. Our review of the record shows that the trial court here similarly advised the jury that defendant "has no burden to prove his innocence" and repeatedly instructed the jury that the State bore the burden of proof, not defendant. Accordingly, we see no plain error in this instruction.
Where the instructions to the jury, taken as a whole, present the law fairly and clearly to the jury, we will not find error even if isolated expressions, standing alone, might be considered erroneous. State v. Chandler, 342 N.C. 742, 751-52, 467 S.E.2d 636, 641 (citing McWilliams, 277 N.C. at 684-85, 178 S.E.2d at 479), cert. denied, 519 U.S. 875, 136 L. Ed. 2d 133 (1996). The sentences and phrases highlighted here by defendant cannot be scrutinized out of context for inferential error. Id. Even assuming arguendo that these portions of the instructionswere improper, we fail to see how the jury would have reached a different result. Compelling evidence of defendant's guilt was presented at trial, and the instructions, taken as a whole, were correct. This assignment of error is overruled.
SENTENCING ISSUES
Defendant raises several issues relating to the jury's perception of possible sentences in this case. Before trial, defendant filed a motion in limine pursuant to Rule 403 of the North Carolina Rules of Evidence to exclude evidence of a prior life sentence on the ground that the jury might confuse the sentences of life imprisonment with the possibility of parole and life imprisonment without parole. The trial court denied defendant's motion. When defendant testified during the guilt-innocence phase of the trial, he acknowledged on cross-examination that previously he had been convicted of second-degree murder and received a life sentence.
Defendant asserts that the admission of his prior life sentence misled the jury into believing that, because he received parole in that earlier case, he could again be paroled if sentenced to life in this case. However, when a defendant chooses to testify, evidence of the time and place of a prior conviction, along with the sentence imposed, is admissible under Rule 609(a) of the North Carolina Rules of Evidence for the purpose of impeaching his or her credibility. State v. Lynch, 334 N.C. 402, 408-09, 432 S.E.2d 349, 352 (1993). The prosecutor's two-question impeachment of defendant as to this prior conviction did not exceed the permissible scope of inquiry. Defendant's next argument with respect to his prior murder conviction relates to remarks made by the prosecutor to the jury during the sentencing proceeding. The prosecutor argued that "[a] life sentence would be a travesty of justice" because defendant could write poems, play his guitar, and enjoy human contact. The prosecutor pointed out that, if given a life sentence, defendant could pose a danger to guards, inmates, and others within the prison. The prosecutor emphasized this argument by stating that "[t]here's only one way to keep that cold-blooded killer from killing again."
Defendant claims that the prosecutor improperly implied in these arguments that he might become eligible for parole if given a life sentence. However, while defendant correctly points out that evidence regarding parole eligibility is not a relevant consideration in a capital sentencing proceeding, State v. Conaway, 339 N.C. 487, 520, 453 S.E.2d 824, 845, cert. denied, 516 U.S. 884, 133 L. Ed. 2d 153 (1995), this Court has held that "it is not improper for a prosecutor to urge the jury to recommend death out of concern for the future dangerousness of the defendant," State v. Williams, 350 N.C. 1, 28, 510 S.E.2d 626, 644, cert. denied, 528 U.S. 880, 145 L. Ed. 2d 162 (1999). See also State v. McNeil, 350 N.C. 657, 687, 518 S.E.2d 486, 504 (1999), cert. denied, 529 U.S. 1024, 146 L. Ed. 2d 321 (2000). Here, the prosecutor's argument did not "improperly interject[] defendant's prior parole eligibility" to suggest that defendant would be eligible for parole if death was not imposed. State v. Cummings, 352 N.C. 600, 629, 536 S.E.2d 36, 57 (2000), cert.denied, 532 U.S. 997, 149 L. Ed. 2d 641 (2001). In the case at bar, "the prosecutor never used the word 'parole' and never mentioned the possibility that a life sentence could mean that defendant would eventually be released." Williams, 350 N.C. at 28, 510 S.E.2d at 644. Instead, the prosecutor permissibly argued that defendant might endanger others if the jury did not recommend death. The prosecutor's argument was not improper.
Defendant argues that the trial court erred in rejecting his proposed instruction relating to the difference between a life sentence for a first-degree murder conviction and a life sentence for a second-degree murder conviction. Prior to the sentencing proceeding, defendant moved the trial court to instruct the jury that "a sentence of life in prison is different for first-degree and for second-degree murder. I . . . instruct you that a sentence of life in prison in this case would be life in prison without parole." The trial court denied this motion and instructed the jury as follows:
Now, members of the jury, having found the Defendant guilty of Murder in the First Degree, it is now your duty to decide whether to recommend to the Court whether the Defendant should be sentenced to death or to life in prison without parole. Your recommendation would be binding upon the Court. If you unanimously recommend that the Defendant is to be sentenced to death, the Court will impose the sentence of death. If you unanimously recommend a sentence of life imprisonment without parole, the Court will impose a sentence of life imprisonment without parole.
The jury recommended death. Defendant contends the trial court's instructions to the jury did not correctly instruct that a life sentence means life without parole. N.C. Gen. Stat. § 15A-2002 provides:
If the recommendation of the jury is that the defendant be sentenced to death, the judge shall impose a sentence of death in accordance with the provisions of Chapter 15, Article 19 of the General Statutes. If the recommendation of the jury is that the defendant be imprisoned for life in the State's prison, the judge shall impose a sentence of imprisonment for life in the State's prison, without parole.
The judge shall instruct the jury, in words substantially equivalent to those of this section, that a sentence of life imprisonment means a sentence of life without parole.
N.C.G.S. § 15A-2002 (2003). In the instant case, the trial court's instructions mirrored the language contained in this statute. Therefore, the jury was adequately informed of the meaning of life imprisonment, i.e., life without parole. See State v. Haselden, 357 N.C. 1, 12, 577 S.E.2d 594, 601-02, cert. denied, ___ U.S. ___, 157 L. Ed. 2d 382 (2003). See also State v. Davis, 353 N.C. 1, 41, 539 S.E.2d 243, 269 (2000) ("We find nothing in the statute that requires the judge to state 'life imprisonment without parole' every time he alludes to or mentions the alternative sentence."), cert. denied, 534 U.S. 839, 151 L. Ed. 2d 55 (2001); State v. Steen, 352 N.C. 227, 273-75, 536 S.E.2d 1, 28-29 (2000) (no error when the trial court refused to instruct the jury on how parole laws had changed), cert. denied, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001). This assignment of error is overruled. Defendant next claims that the trial court erred in denying his requests to modify the North Carolina Pattern Jury Instructions pertaining to capital sentencing. Defendant argues that his proposals would address a tendency of jurors to favor the State and would correct juror misinterpretation of standard jury instructions, as alleged in several studies. See, e.g., James Luginbuhl and Julie Howe, Discretion in Capital Sentencing Instructions: Guided or Misguided?, 70 Ind. L.J. 1161 (1995). Defendant further contends that the trial court's denial of his requests violated the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 27 of the North Carolina Constitution.
Defendant urged the trial court to make the following modifications to the sentencing instructions: substitute all references to the jury "recommending" defendant's sentence with language indicating that it is their "duty" to sentence defendant either to death or to life imprisonment without parole; include the phrase "without parole" with every reference to life imprisonment; delete the language that requires the jury unanimously to find a sentence of life imprisonment without parole; and delete any portion of the instructions that placed the burden of proof on defendant to prove the existence of mitigating circumstances or that the mitigating circumstances outweighed the aggravating circumstances. The trial court sustained the State's objection to defendant's requests and instructed the jury in accordance with N.C. Gen. Stat. § 15A-2000and the North Carolina Pattern Jury Instructions. See 1 N.C.P.I.-Crim. 150.10 (2004).
This Court has previously held that the trial court is not required to give the exact instructions requested by a defendant. See State v. Monk, 291 N.C. 37, 54, 229 S.E.2d 163, 174 (1976). Instead, requested instructions need only be given in substance if correct in law and supported by the evidence. State v. Bell, 338 N.C. 363, 391, 450 S.E.2d 710, 726 (1994), cert. denied, 515 U.S. 1163, 132 L. Ed. 2d 861 (1995). Here, the trial court used the pattern jury instructions to give in substance those of defendant's requested instructions which were correct in law. For instance, the trial court properly instructed that if the State did not prove that the mitigating circumstances were insufficient to outweigh the aggravating circumstances, it was the jury's "duty to recommend that the Defendant be sentenced to life imprisonment without parole." We have encouraged the trial court to utilize the pattern jury instructions "[g]iven the danger of distraction and prejudice and the desirability of uniform jury instructions for all trials, despite the unique features of each." Artis, 325 N.C. at 295, 384 S.E.2d at 479. In addition, the trial court correctly declined to give those portions of defendant's requested instructions which were not supported by the law. See N.C.G.S. §§ 15A-2000(b), -2002 (2003) (providing that the jury recommends a unanimous sentence that the trial judge then imposes); Davis, 353 N.C. at 41, 539 S.E.2d at 269 (trial judge need not add the phrase "without parole" to every reference to a life sentence);State v. Johnson, 298 N.C. 47, 76, 257 S.E.2d 597, 618 (1979) (requiring the defendant to prove mitigating circumstances by a preponderance of the evidence). Furthermore, defendant has not demonstrated that the instructions given were erroneous or prejudicial to him. He has presented no evidence that any juror misunderstood or failed to follow the court's instructions, misapplied the law, or reached the sentencing recommendation by inappropriate means. The court's instructions were correct and met both state and federal constitutional standards. This assignment of error is overruled.
Defendant next contends that the trial court erred in submitting his prior conviction of second-degree murder in support of the aggravating circumstance that he had been previously convicted of a prior violent felony. N.C.G.S. § 15A-2000(e)(3) (2003). On 10 May 1976, defendant pled guilty to second-degree murder. On 7 May 1999, defendant filed a motion for appropriate relief (MAR) in which he claimed that the State obtained the 1976 conviction in violation of his constitutional right to effective assistance of counsel. The superior court judge who considered the MAR was not the judge who presided over the instant case. The MAR judge, without conducting an evidentiary hearing, examined the file of the 1976 case and determined that defendant had stated under oath in open court that he was pleading guilty "of [his] own free will" and was "satisfied with his [lawyer's] services." Based upon those declarations, the MAR judge denied defendant's motion. Defendant then, on 4 June 1999, filed in the case at bar a motion in limine to preclude the introduction of his prior murder conviction on the same basis as recited in his MAR. This motion was also denied.
The trial court properly submitted the prior murder conviction as an aggravating circumstance, pursuant to N.C. Gen. Stat. § 15A-2000(e)(3). See State v. Prevatte, 356 N.C. 178, 256, 570 S.E.2d 440, 483 (2002), cert. denied, 538 U.S. 986, 155 L. Ed. 2d 681 (2003). As to the resolution of his MAR, defendant concedes that this Court's holding in State v. Wiley, 355 N.C. 592, 565 S.E.2d 22 (2002), cert. denied, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003), controls but asks that we reconsider our holding in that case. In Wiley, a capital case, the defendant filed a MAR alleging ineffective assistance of counsel in a juvenile matter that had occurred approximately seven years before the defendant's murder trial. The trial court denied the MAR, and the prior adjudication of delinquency was then used as a basis for submitting to the jury the prior violent felony aggravating circumstance in his capital murder case. Thereafter, when the defendant appealed his murder conviction to this Court, he also sought our review of the trial court's denial of his MAR. We denied the defendant's petition for writ of certiorari, State v. Wiley, 548 S.E.2d 158 (2001), and his motion to bypass the Court of Appeals, id., and held that "the [ineffective assistance of counsel] claim aris[ing] from defendant's juvenile case . . . must be raised in a separate proceeding." 355 N.C. at 606, 565 S.E.2d at 34. Accordingly, defendant's MAR alleging ineffectiveassistance of counsel in his prior murder case is not properly before us. This assignment of error is overruled.
Defendant next argues that the trial court erred in submitting his prior conviction in Georgia of robbery by sudden snatch to support the prior violent felony aggravating circumstance. N.C.G.S. § 15A-2000(e)(3). Defendant claims that the State failed to present sufficient evidence that this offense involved "the use or threat of violence." Id. He supports this argument with citations to Georgia statutes and Georgia case law which state that neither physical injury nor the threat of violence is an element of robbery by sudden snatch. However, we have held that violence need not be an element of an offense in order for a prior conviction to be admissible under (e)(3). State v. McDougall, 308 N.C. 1, 18, 301 S.E.2d 308, 319, cert. denied, 464 U.S. 865, 78 L. Ed. 2d 173 (1983). The aggravating circumstance may be submitted where the use or threat of violence was actually involved in the commission of the crime. Id.
Defendant relies on State v. Robertson, 138 N.C. App. 506, 531 S.E.2d 490 (2000), cert. denied, 560 S.E.2d 357 (2002), to support his contention that the act of snatching a purse involves neither actual nor constructive violence. In that case, a divided Court of Appeals vacated the defendant's robbery conviction because the defendant did not use violence, actual or constructive, to gain possession of the victim's purse. "[T]he only force used by defendant was that sufficient to remove her purse from her shoulder. Defendant never attempted to overpower her or otherwise restrain her. Rather, this was no more than atypical purse-snatching incident, which courts in other jurisdictions routinely have held to be larceny, not robbery." Id. at 509, 531 S.E.2d at 493.
Robertson is distinguishable from the instant case. Here, Gary Garner, a former employee of the Georgia Bureau of Investigation, testified at defendant's sentencing proceeding that in 1974 he saw defendant sprint up to a woman and snatch her purse. The victim "started screaming and holding onto her purse. And they fought over the purse, and he slung her down and snatched the purse, the lady was still screaming, and then he ran." On further questioning, Agent Garner confirmed that defendant forced the victim to her knees or to a sitting position as she tried to defend her purse. While the act of purse snatching may not invariably involve the use or threat of violence, Garner's testimony as to the circumstances surrounding this prior felony was sufficient to prove that violence was actually used during the commission of the crime. Accordingly, the trial court's submission of the (e)(3) aggravating circumstance in this case was proper. This assignment of error is overruled.
PRESERVATION ISSUES
Defendant raises additional issues that he concedes have been decided against him by this Court. Defendant complains that the trial court erred in permitting the jury to be death qualified. We have repeatedly held that prospective jurors who express an unequivocal opposition to the death penalty may be excused without violating a defendant's constitutional rights. See Gladden, 315 N.C. at 438-39, 340 S.E.2d at 698; State v. Young, 312 N.C. 669, 686, 325 S.E.2d 181, 191 (1985); State v. Avery, 299 N.C. 126, 135-37, 261 S.E.2d 803, 809-10 (1980). Defendant argues that the trial court erred in submitting the aggravating circumstance that the murder "was especially heinous, atrocious, or cruel" because it is unconstitutionally vague. N.C.G.S. § 15A-2000(e)(9) (2003). We have previously held that this aggravating circumstance is constitutional. State v. Syriani, 333 N.C. 350, 388-92, 428 S.E.2d 118, 138-41, cert. denied, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Further, defendant contends that the trial court erred in instructing the jury that it must not consider any nonstatutory mitigating circumstance unless it is deemed to have mitigating value. This Court has upheld such instructions. State v. Hill, 331 N.C. 387, 417-18, 417 S.E.2d 765, 780 (1992), cert. denied, 507 U.S. 924, 122 L. Ed. 2d 684 (1993).
Defendant raises these issues for the purposes of urging this Court to reconsider its prior decisions and preserving his right to argue these issues on federal review. We have considered defendant's arguments on these additional issues and find no compelling reason to depart from our previous holdings.
These assignments of error are overruled.
Lastly, defendant suggests that the record is insufficient to reveal potential ineffective assistance of counsel claims. Defendants are required to raise on direct review any ineffective assistance of counsel claims that areapparent from the record. See N.C.G.S. § 15A-1419(a)(3) (2003). If such apparent claims are not raised on direct appeal, they are subject to procedural default. Id. Accordingly, defendant is entitled to assert in a subsequent MAR any ineffective assistance of counsel claims not apparent from the record. See State v. Long, 354 N.C. 534, 539-40, 557 S.E.2d 89, 93 (2001); State v. Fair, 354 N.C. 131, 166-67, 557 S.E.2d 500, 524-25 (2001), cert. denied, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002); State v. Kinch, 314 N.C. 99, 106, 331 S.E.2d 665, 669 (1985).
PROPORTIONALITY REVIEW
We now consider (1) whether the aggravating circumstances are supported by the record in this case; (2) whether the jury recommended the death sentence under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2003).
The jury found the aggravating circumstances that "defendant had been previously convicted of a felony involving the use or threat of violence" on two occasions, id. § 15A-2000(e)(3); and that the murder "was especially heinous, atrocious, or cruel," id. § 15A-2000(e)(9). After a thorough review of the record, we conclude that the evidence supports both aggravating circumstances. In addition, nothing in the record suggests the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Finally, we must determine whether the death sentence was excessive or disproportionate by comparing the present case with other cases in which we have found the death sentence to be disproportionate. State v. McCollum, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), cert. denied, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). This Court has found the death sentence disproportionate on eight occasions. State v. Kemmerlin, 356 N.C. 446, 573 S.E.2d 870 (2002); State v. Benson, 323 N.C. 318, 372 S.E.2d 517 (1988); State v. Stokes, 319 N.C. 1, 352 S.E.2d 653 (1987); State v. Rogers, 316 N.C. 203, 341 S.E.2d 713 (1986), overruled in part on other grounds by State v. Gaines, 345 N.C. 647, 483 S.E.2d 396, cert. denied, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), and by State v. Vandiver, 321 N.C. 570, 364 S.E.2d 373 (1988); Young, 312 N.C. 669, 325 S.E.2d 181 (1985); State v. Hill, 311 N.C. 465, 319 S.E.2d 163 (1984); State v. Bondurant, 309 N.C. 674, 309 S.E.2d 170 (1983); State v. Jackson, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any of these cases.
Several factors support the determination that the imposition of the death penalty in this case was neither excessive nor disproportionate. The evidence indicated that defendant's attack on the victim was unprovoked, that defendant began the affray with a knife and then switched to a bottle to hit, stab, and slash the victim numerous times, and that at some point defendant had pulled down the victim's pants. The jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation, which suggests a "calculated andcold-blooded crime." State v. Lee, 335 N.C. 244, 297, 439 S.E.2d 547, 575, cert. denied, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). In addition, the jury's finding of the (e)(3) aggravating circumstance was based upon defendant's prior convictions of second-degree murder and robbery by sudden snatch. We have never held that a death sentence was disproportionate where a jury found the (e)(3) aggravating circumstance. State v. Peterson, 350 N.C. 518, 538, 516 S.E.2d 131, 143-44 (1999), cert. denied, 528 U.S. 1164, 145 L. Ed. 2d 1087 (2000). Finally, the jury found the (e)(9) aggravating circumstance, which we have held is sufficient, standing alone, to affirm a death sentence. Roache, 358 N.C. at 330, 595 S.E.2d at 436 (citing State v. Bacon, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), cert. denied, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995)). Considering defendant's violent history and the brutal nature of the present crime, this case is more similar to cases in which we have found the sentence of death proportionate.
Based upon the foregoing, we conclude that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.
NO ERROR.
Justice NEWBY did not participate in the consideration or decision of this case.