STATE OF NORTH CAROLINA v. LARRY CHAMPION

No. COA04-1264

(Filed 19 July 2005)

1. **Appeal and Error— appellate rule violations—failure to argue—failure to cite specific assignment of error—failure to attach pertinent portions of proceedings to brief**

Defendant's ten assignments of error that he did not support in his brief are deemed abandoned under N.C. R. App. P. 28(b)(6). Although defendant failed to cite the specific assignment of error that he contends supports his one remaining assignment of error and failed to attach to his brief the pertinent portions of the trial proceedings related to the argument in violation of N.C. R. App. P. 28(b)(6) and (d)(1), the Court of Appeals exercised its discretion under N.C. R. App. P. 2 to examine the merits of defendant's argument.

STATE v. CHAMPION

[171 N.C. App. 716 (2005)]

**2. Evidence; Constitutional Law— hearsay—residual hearsay exception—right of confrontation—harmless error**

The trial court erred in a first-degree murder case by allowing a detective to testify as to what a witness told her on the date of the attack under the residual hearsay exception of N.C.G.S. § 8C-1, Rule 804(b)(5) because the court improperly considered the corroborative nature of the statements in determing their trustworthiness. Defendant's Sixth Amendment right of confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004) was also violated by the admission of those statements because, although the witness had died and was thus unavailable, there was no indication that defendant was given the opportunity to cross-examine the witness regarding the statements. However, the erroneous admission of the statements was harmless beyond a reasonable doubt when: (1) the jury heard similar evidence from other sources and was free to determine defendant's guilt based upon evidence irrespective of the witness's statements; and (2) there was overwhelming evidence establishing defendant's guilt.

Appeal by defendant from judgment entered 13 June 2003 by Judge James C. Spencer in Wake County Superior Court. Heard in the Court of Appeals 6 June 2005.

*Attorney General Roy Cooper, by Special Deputy Attorney General Alexander McC. Peters, for the State.*

*Center for Death Penalty Litigation, by Shelagh Rebecca Kenney, for defendant-appellant.*

TIMMONS-GOODSON, Judge.

Larry Champion ("defendant") appeals his conviction for first-degree murder. For the reasons discussed herein, we hold that defendant received a trial free of prejudicial error.

The State's evidence presented at trial tends to show the following: In June 1998, defendant's wife, Lora Champion ("Lora"), and defendant's son, Bryan Champion ("Bryan"), were living at a residence shared by Jennifer Harris ("Jennifer") and her children. On the morning of 8 June 1998, defendant began knocking on Jennifer's front door. Jennifer's ten-year-old son, Jonathan Harris ("Jonathan"), looked out the peephole of the front door and informed Jennifer that defendant was at the front door. Jonathan stood nearby and watched

Lora open the door. Jonathan heard Lora initially refuse to speak with defendant, and then he heard Lora inform defendant that they could speak on the porch of the residence. However, defendant "wanted to come in instead[,]" and he thereafter forced his way past Lora. Shortly after defendant entered the residence, he and Lora began to "struggle." Jonathan saw defendant "trying to come in" the residence and Lora "trying to push him out[,]" and Jonathan then saw Lora fall "backwards" over a couch and land on her stomach. Defendant thereafter "attacked" Lora, and Jonathan initially thought defendant was "punching her." However, after seeing defendant's hand "turned upright" while he attacked Lora, Jonathan and Jennifer fled to Jennifer's bedroom.

Once Jonathan and Jennifer reached Jennifer's bedroom, Jennifer barricaded the door with a dresser and called 9-1-1. While she was on the phone with the 9-1-1 dispatcher, defendant attempted to enter the room. Defendant eventually forced his way inside, and he looked "angered." Jonathan saw a knife in defendant's hand. When Jennifer reached for the knife, defendant bit her on the hand. Jennifer told defendant to "just go on and get [his] son," who was in an adjacent bedroom. Defendant thereafter "grabbed" Bryan and "went out the front door."

Raleigh Police Department Officer Shawn Woolrich ("Officer Woolrich") was dispatched to Jennifer's residence to investigate the 9-1-1 call. As Officer Woolrich approached the residence, he saw defendant exiting the front door. Defendant was holding Bryan in his left arm and concealing his right hand from Officer Woolrich's view. Officer Woolrich noted that defendant's jacket and blue jeans were "heavily blood stained," and he "felt certain [he] was looking at the person who [he] was sent to find." Officer Woolrich drew his weapon and repeatedly ordered defendant to release Bryan. Defendant eventually complied with Officer Woolrich's orders, and Officer Woolrich directed Bryan back inside the residence. After noticing "a bloody knife protruding from [defendant's] back pocket[,]" Officer Woolrich "tossed" the knife away from defendant and handcuffed him.

Defendant was taken into custody and transported to the Raleigh Police Department. After he signed a waiver form and indicated that he understood his rights, defendant answered law enforcement officers' questions about the attack. Defendant initially informed the officers that he had gone to Jennifer's residence to ask Lora to take him to the doctor, and that they soon began arguing. Defendant stated

that Lora thereafter left the room for a moment, but returned with a knife and started pushing and hitting him. Defendant recalled Lora being stabbed in the ensuing struggle, during which he was reaching for the knife to take it away from Lora. Defendant told the officers that after Lora was stabbed, he went to Jennifer's room. Defendant stated that he asked Jennifer for some clothes for Bryan, and he left when she told him to do so.

After listening to defendant's initial version of the events, the interviewing officers "confronted" defendant "on several issues." The officers were confused by defendant's statement that he could not see the knife and that it was dark in the room, and the officers believed "there was no way [Lora] could be stabbed as many times as she was if [defendant] was just reaching for the knife to take it away from her." After the veracity of his first version of the attack was questioned, defendant provided the officers with a second version of the attack. In his second version, defendant stated that he had taken the knife out of his mother's kitchen before going to Jennifer's residence, and that he had done so because Lora was a "violent person." Defendant further stated that when he arrived at Jennifer's residence, he and Lora began arguing, and Lora hit him. Defendant told the officers that as the two "were wrestling around[,]" he "reached into [his] back pocket and pulled the knife out and stabbed her with it." Defendant recalled Lora "mak[ing] some unusual breathing noises as [he] walked past her on [his] way out of the house." Defendant stated that after Lora did not answer him, he "went into [Jennifer's] room to ask her about getting some clothes for [his] son." Defendant recalled "push[ing] the door in" and noticing that Jennifer was "on the phone with the police" when he entered. Defendant stated that as he "was trying [to] get her to calm down[,]" Jennifer "grabbed [his] hand and [he] bit her to get her to let go." Defendant informed the officers that he thereafter went to Bryan's room and "took him and was leaving when the police came."

After the attack, Lora was transported to Wake Medical Center, where she subsequently died. On 20 July 1998, defendant was indicted for the first-degree murder of Lora. A superceding indictment, charging defendant with first-degree murder with aggravating circumstances, was filed on 25 February 2003. Defendant's trial began the week of 9 June 2003.

At trial, defendant objected to the State's presentation of hearsay statements made by Jennifer to Raleigh Police Department Detective H. Faulkner ("Detective Faulkner") the day of the attack. After hear-

ing *voir dire* examination and arguments from both parties, the trial court denied defendant's motion to exclude the statements, concluding that the statements were admissible under the residual hearsay exception. Following the State's presentation of its evidence, defendant presented evidence that he was not mentally competent at the time of the attack and was unable to form the specific intent to kill Lora. In rebuttal, the State presented evidence that defendant was able to form the specific intent to kill Lora.

On 13 June 2003, the jury returned a guilty verdict on the charge of first-degree murder. The trial court thereafter sentenced defendant to life imprisonment without parole. Defendant appeals.

[1] We note initially that defendant's appeal contains several violations of the North Carolina Rules of Appellate Procedure. First, defendant's brief contains arguments supporting only one of the eleven original assignments of error on appeal. Pursuant to N.C.R. App. P. 28(b)(6) (2005), the omitted assignments of error are deemed abandoned. Furthermore, in his brief, defendant does not cite the specific assignment of error that he contends supports his one remaining argument, and he does not attach to his brief the pertinent portions of the trial proceedings related to the argument. While we recognize that defendant has therefore further violated N.C.R. App. P. 28(b)(6) and (d)(1), and that such violations may result in waiver of the assignment of error, *see State v. Gaither*, 148 N.C. App. 534, 538, 559 S.E.2d 212, 215 (2002) and *State v. Call*, 349 N.C. 382, 408, 508 S.E.2d 496, 513 (1998), in our discretion pursuant to N.C.R. App. P. 2, we have chosen to overlook these errors and examine the merits of defendant's argument.

[2] Defendant's only argument on appeal is that the trial court erred by allowing Detective Faulkner to testify as to what Jennifer told her on the date of the attack. Defendant asserts that the trial court considered improper factors in determining whether Jennifer's statements were admissible under the residual hearsay exception.

N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) (2003) allows the introduction of a hearsay statement where, even though the statement is not covered by a specific exception, the statement's declarant is unavailable and the statement possesses "circumstantial guarantees of trustworthiness" equivalent to other hearsay exceptions. In order to allow the admission of a hearsay statement under this "residual" exception, the trial court must find that the declarant is unavailable. *State v.*

*Triplett,* 316 N.C. 1, 8, 340 S.E.2d 736, 740 (1986). Thereafter, the trial court must determine:

(1) Whether the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and of its particulars;

(2) That the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4);

(3) That the statement possesses "equivalent circumstantial guarantees of trustworthiness";

(4) That the proffered statement is offered as evidence of a material fact;

(5) Whether the hearsay is "more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable means"; and

(6) Whether "the general purposes of [the] rules [of evidence] and the interests of justice will best be served by admission of the statement into evidence."

*State v. Ali,* 329 N.C. 394, 408, 407 S.E.2d 183, 191-92 (1991) (quoting N.C. Gen. Stat. § 8C-1, Rule 804(b)(5)) (alterations in original). In deciding whether a hearsay statement possesses the requisite "equivalent circumstantial guarantees of trustworthiness," the trial court considers:

(1) the declarant's personal knowledge of the underlying event; (2) the declarant's motivation to speak the truth; (3) whether the declarant recanted; and (4) the reason, within the meaning of Rule 804(a), for the declarant's unavailability.

*State v. Nichols,* 321 N.C. 616, 624, 365 S.E.2d 561, 566 (1988). "The trial court should make findings of fact and conclusions of law when determining if an out-of-court hearsay statement possesses the necessary circumstantial guarantee of trustworthiness to allow its admission." *State v. Swindler,* 339 N.C. 469, 474, 450 S.E.2d 907, 910-11 (1994).

In the instant case, Detective Faulkner testified during *voir dire* that Jennifer told her that Lora and defendant had been "having problems" and had "split up" approximately three months prior to the attack. Detective Faulkner also testified that Jennifer informed her that Lora had told Jennifer that she had tried to work on their problems, but that "[i]t was time for [Lora and defendant] to go their sep-

arate ways." Detective Faulkner further testified as to what Jennifer remembered about the attack. Following examination of Detective Faulkner by defendant and argument from both parties, the trial court allowed Detective Faulkner to testify regarding Jennifer's statements, concluding that the statements "possess sufficient equivalent circumstantial guarantees of trustworthiness." We conclude that the trial court erred.

Although the trial court's examination of a hearsay statement's trustworthiness is based upon the totality of the circumstances surrounding the statement, *State v. Richmond*, 347 N.C. 412, 436-37, 495 S.E.2d 677, 690, *cert. denied*, 525 U.S. 843, 142 L. Ed. 2d 88 (1998), the trial court must not consider the corroborative nature of the statement when determining whether it qualifies as residual hearsay. *See Idaho v. Wright*, 497 U.S. 805, 822-23, 111 L. Ed. 2d 638, 656-57 (1990). Instead, " '[h]earsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.' " *State v. Hinnant*, 351 N.C. 277, 288, 523 S.E.2d 663, 670 (2000) (quoting *Wright*, 497 U.S. at 822, 111 L. Ed. 2d at 657), *cert. dismissed*, — N.C. —, 604 S.E.2d 292 (2004), *cert. denied*, — U.S. —, 161 L. Ed. 2d 737 (2005); *see Swindler*, 339 N.C. at 475, 450 S.E.2d at 911 ("Corroborating evidence should not be used to support a hearsay statement's particularized guarantee of trustworthiness."). In the instant case, in its "determination [regarding] the trustworthiness of the proffered statements," the trial court found as fact that "[t]he statements made by Jennifer [] appear to be consistent with other evidence concerning the facts as they were—as they have been determined to be, although . . . Jennifer [] did make certain statements which were actually not available from any other source." In light of the foregoing, we conclude that the trial court erred by considering the corroborative nature of Jennifer's statements.[1]

Furthermore, we note that "the Confrontation Clause bars the admission of out-of-court testimonial statements unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him or her." *State v. Morgan*, 359 N.C. 131, 154, 604 S.E.2d 886, 900 (2004) (citing *Crawford v. Washington*, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 203 (2004)). Because defendant had filed notice of appeal with this Court and his case was pending when *Crawford* was

---

1. Because we conclude that the trial court erred by considering the corroborative nature of the statements, we need not address defendant's additional assertions regarding their inadmissibility.

issued, the decision applies to the instant case. *Morgan*, 359 N.C. at 154, 604 S.E.2d at 900. Here, the record reflects that Jennifer died in 2001, after the date of the attack and her interview with Detective Faulkner, but prior to defendant's trial. However, there is no indication that defendant was given an opportunity to cross-examine Jennifer regarding her statements to law enforcement officers. Therefore, defendant's Sixth Amendment right to confrontation under *Crawford* was also violated by the trial court's determination. *See Id.* at 155-56, 604 S.E.2d at 901 (holding that deceased's statement to law enforcement officer was testimonial in nature because knowingly given in response to structured police questioning, and denial of opportunity to cross-examine deceased regarding the statement violated Sixth Amendment right to confront accuser).

We note that not every constitutional violation necessarily requires a new trial. *Id.* at 156, 604 S.E.2d at 901. Instead, where the State demonstrates that the constitutional violation was "harmless beyond a reasonable doubt," the error is deemed non-prejudicial, and reversal of a conviction is not required. *Id*; N.C. Gen. Stat. § 15A-1443(b) (2003). Our courts have previously concluded that "the presence of overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt." *State v. Autry*, 321 N.C. 392, 400, 364 S.E.2d 341, 346 (1988); *State v. McKeithan*, 140 N.C. App. 422, 432, 537 S.E.2d 526, 533 (2000), *disc. review denied and appeal dismissed*, 353 N.C. 392, 547 S.E.2d 35 (2001). After reviewing the record in the instant case, we conclude that the trial court's errors do not necessitate reversal of defendant's conviction.

Defendant contends that Jennifer's statements to Detective Faulkner were used to demonstrate that defendant acted with premeditation and deliberation. However, "[p]remeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence." *State v. Gladden*, 315 N.C. 398, 430, 340 S.E.2d 673, 693, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986). Therefore,

> Among [the] circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased;

(4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner. . . . [T]he nature and number of the victim's wounds are circumstances from which premeditation and deliberation can be inferred.

*Id.* at 430-31, 340 S.E.2d at 693 (citations omitted).

In the instant case, Jonathan testified that defendant knocked on the front door of his residence, began arguing with Lora, and then forced his way inside. Jonathan further testified that after defendant "attacked" Lora, he and Jennifer fled to Jennifer's bedroom. Jonathan recalled defendant forcing his way inside Jennifer's bedroom, holding a knife, and looking "angered." The State introduced into evidence recorded copies and a transcript of Jennifer's call to the 9-1-1 dispatcher, during which a male voice in the background states, "I told you she was going to get it." Officer Woolrich testified that defendant's clothing was "heavily blood stained" when he was arrested, and that defendant was carrying "a bloody knife" in his back pocket. Raleigh Police Department Detective Randy Miller ("Detective Miller") testified that defendant informed him after his arrest that "[h]e had taken a kitchen knife out of his mother's drawer and took it with him" to Jennifer's residence the date of the attack. Defendant also admitted to the officers that he stabbed Lora after "[h]e got mad and began tussling with her[,]" and he recalled hearing Lora "make some unusual breathing noises" afterwards. Detective Miller testified that defendant's mother "acknowledged that [the knife] looked like one of her knives[,]" and, after she searched her kitchen, defendant's mother informed the officers that her "favorite knife" was missing. Doctor Dewey Pate ("Dr. Pate") of Wake Medical Center testified that Lora suffered "approximately 51 stab wounds or lacerations" during the attack, and that the wounds were located on her neck, chest, face, arms, and hands. Dr. Pate stated that Lora suffered a stab wound to her kidney, and he noted that some of the multiple stab wounds on her neck were "deep enough to penetrate [her] voice box and larynx and underlying air tube or trachea[.]" Dr. Pate also testified that two main arteries on the left and right side of Lora's neck had been severed during the attack, and that the severing of these two arteries was the ultimate cause of Lora's death.

Defendant maintains that the State's continual reference to defendant's jealousy and the status of his relationship with Lora demonstrates that the State "relied heavily" upon Jennifer's state-

ments to establish malice, and, therefore, defendant's guilt. However, we note that the jury heard similar evidence from other sources, and was free to determine defendant's guilt based upon evidence irrespective of Jennifer's statements. Defendant's mother informed officers that prior to the attack, defendant and Lora had been arguing "[o]ver their relationship." Defendant told the officers himself that he "wondered if [Lora] had someone else[,]" and he stated that he "knew [he and Lora] would not get back together." Therefore, after reviewing the entire record in the instant case, we conclude that any erroneous admission of Jennifer's statements was harmless in light of the overwhelming evidence establishing defendant's guilt. Accordingly, we hold that defendant received a trial free of prejudicial error.

No error.

Chief Judge MARTIN and Judge WYNN concur.