INMAN, Judge.
Defendant Adam Joshua Sanders ("Defendant") appeals from a judgment entered following a jury trial in which he was found guilty of five methamphetamine-related charges, including conspiracy to traffic in methamphetamine by possession and transportation. Defendant argues that the trial court erred in denying his motion to dismiss all charges because the State failed to show that he entered into an agreement to transport and deliver over 400 grams of methamphetamine as required by the conspiracy charge. After careful review, we hold Defendant has failed to demonstrate error.
I. FACTUAL AND PROCEDURAL HISTORY
The evidence introduced at trial tended to show the following:
On 18 June 2015, Defendant and a man named Brodie Hamilton ("Hamilton") visited the home of Randall Stanley ("Stanley") in search of someone to make a trip to Atlanta to purchase drugs. Inside the home, Defendant sat down next to Stanley at his bar while Hamilton asked Stanley if his eldest son, Justin, would be willing to make the drive. Before Stanley could answer, Defendant stated that Justin would not be available to make the trip because he had just gotten a new job. Instead, Defendant asked Stanley if he would be willing to make the "run." Stanley refused, and Defendant and Hamilton left the home together.
Defendant and Hamilton returned to the Stanley residence the following morning, again in search of a "mule."[1] The two entered Stanley's home upon arrival; eventually, Hamilton left to go speak with Stanley's other son, Jeremy, in a camper trailer on the property while Defendant stayed in the house with Stanley. At the camper, Hamilton spoke with Jeremy, who agreed to make the run. Hamilton and Defendant then departed the premises and returned a short while later, followed by two other men, one of whom was Defendant's brother. Defendant went inside the home with Stanley while Hamilton left a bag outside the door; Jeremy picked up the bag, returned to his camper, and counted $17,000 from a box inside the bag while his girlfriend and fellow mule, Elizabeth Tice ("Tice"), looked on. Meanwhile, Hamilton, Defendant, Defendant's brother, and the fourth visitor departed the property, leaving behind a teal Tahoe for the couple to use on the drug-run.
Jeremy and Tice were seasoned mules. Jeremy had taken roughly 15 trips to Atlanta to buy drugs with cash provided by Hamilton, and Tice had accompanied him as a driver on at least eight of those trips. When Tice did not make the trip, Defendant drove down with Jeremy instead. Defendant accompanied Jeremy on his first run after being taught by Hamilton how to carry out drug buys, with Defendant handling the money, the information relating to the purchase, and the actual transaction in Atlanta. Once each run was complete, Stanley would deliver the drugs to either Hamilton or Defendant. Hamilton and Defendant would divide the drugs upon receipt, with Defendant purchasing the methamphetamine at a significant discount from Hamilton. Defendant would then sell the drugs, sometimes out of Hamilton's home. Jeremy got less out of his relationship with Hamilton than Defendant did, however, as Jeremy was not Hamilton's "partner," "best friend," and "the one that sells dope for [Hamilton]."
Jeremy and Tice successfully completed the purchase in Atlanta on 19 June 2015, but their illicit activities caught up to them on the return trip to North Carolina. As they were driving back through southern Macon County, Hamilton called and explained that a police roadblock had been set up in an attempt to apprehend them. Undeterred, Jeremy and Tice resolved to take surface streets and backroads to avoid detection. The plan failed, however, when they turned down a dead end road where a law enforcement officer was waiting. Jeremy and Tice were stopped, searched, and immediately transported to the county jail. Roughly two pounds of methamphetamine were recovered from the Tahoe.
Charles Moody, a lieutenant and chief investigator with the Macon County Sheriff's Office, met with Jeremy and Tice at the jail and asked for their assistance in arresting Hamilton, who was well-known to law enforcement. They agreed to help, and the Sheriff's Office began to set up a sting. Per that plan, Jeremy called Hamilton and informed him that he and Tice had been hiding out after the earlier call about the roadblocks for fear of being caught. Hamilton encouraged Jeremy to keep driving and concluded the conversation; a short time later, Jeremy called back and explained that they had started experiencing car trouble. Defendant then called Jeremy and updated him on the status of a nearby police checkpoint. Finally, Jeremy called Hamilton and told him that he and Tice were parked at the Macon County Welcome Center near the Georgia border due to a problem with the Tahoe's brakes. Hamilton informed Jeremy that Defendant would meet them at the Welcome Center to pick up the drugs; as these calls were being placed, a SWAT team travelled with Jeremy and Tice to the Welcome Center to wait for Defendant. Once there, Jeremy fielded a final call from Defendant, who confirmed that he would be at the Welcome Center to take the methamphetamine.
When Defendant's car arrived at the Welcome Center at around 2 a.m. on 20 June 2015, Jeremy exited the Tahoe and Tice handed him a grocery bag containing a decoy, prepared by law enforcement officers, that matched the weight of the drugs picked up in Atlanta. Jeremy placed the bag on the ground, waiting for Defendant to approach. Defendant walked from his vehicle and, sensing something amiss, asked Jeremy what was wrong. Jeremy answered by shaking his head and walking back to the Tahoe. Defendant then picked up the grocery bag and returned to his car. After Defendant placed the bag on the floorboard of the car but before he could get back into the vehicle, the SWAT team emerged from the woods surrounding the Welcome Center and took Defendant into custody.
Defendant was indicted by grand jury for trafficking in methamphetamine by transportation, trafficking in methamphetamine by possession, and conspiracy to traffic in methamphetamine on 14 December 2015. At trial during the 1 May 2017 session, the State introduced witness testimony consistent with the above from Stanley, Jeremy, Tice, and several law enforcement officers involved in the sting. Tice also testified that she had been offered a plea deal that would sentence her to 10 years in prison, but that she had not yet accepted the deal. She also testified that while she was hopeful that a better deal could be negotiated, she did not believe that she could avoid jail time. Jeremy, on the other hand, testified that he had already agreed to a plea deal at the time of trial. Under its terms, Jeremy would plead guilty to one trafficking charge and be sentenced to serve 90 to 117 months in prison.
Defendant moved to dismiss all charges following the State's presentation of evidence, and the trial court denied the motion. Defendant did not introduce any evidence and renewed his motion; this, too, was denied by the trial court. Following deliberations, the jury found Defendant guilty on all charges, and the trial court sentenced Defendant to three consecutive sentences of 225 to 282 months imprisonment. Defendant entered oral notice of appeal. On 2 November 2018, Defendant also filed a Motion for Appropriate Relief ("MAR") with this Court.
II. ANALYSIS
A. Defendant's MAR
Defendant contends in his MAR that the State elicited false testimony from Jeremy and Tice, pointing to the sentences the two received after testifying in Defendant's case. Reviewing the transcripts and records from the sentencing hearings in Tice's and Jeremy's cases, we see no merit in Defendant's argument.
Defendant's MAR was filed pursuant to N.C. Gen. Stat. § 15A-1418, which provides that "[w]hen a case is in the appellate division for review, a motion for appropriate relief based upon grounds set out in [N.C. Gen. Stat. §] 15A-1415 must be made in the appellate division." N.C. Gen. Stat. § 15A-1418(a) (2017). Because Defendant's argument asserts his rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 13 of the North Carolina Constitution were violated, an enumerated ground for filing an MAR under N.C. Gen. Stat. § 15A-1415(b)(3), this Court has jurisdiction to resolve Defendant's MAR. N.C. Gen. Stat. §§ 15A-1415(b)(3) and 15A-1418(a) - (b) (2017).
Following Defendant's trial, Tice reached a plea deal with the State that was markedly better than that offered prior to her testifying. She ultimately agreed to plead guilty to two counts of attempted trafficking; in exchange, the State dismissed a conspiracy charge and offered a suspended prison sentence with 60 months' probation due to her "extraordinary substantial assistance in testifying at two previous trials and other cooperation with, and assistance of law enforcement." At Tice's sentencing hearing, the prosecutor informed the court that while she had originally been offered the 10-year plea deal, her considerable cooperation and testimony in two criminal trials led the prosecutor to offer a probationary sentence.
Jeremy also received a lighter sentence than the plea deal he had struck prior to testifying in Defendant's case. After Jeremy's testimony and prior to his sentencing, his lawyer filed a brief arguing that he should receive a suspended sentence because, inter alia , he had provided substantial assistance to law enforcement within the scope of N.C. Gen. Stat. § 9-95(h)(5). During Jeremy's sentencing hearing, the prosecutor stated that the State was "not willing to guarantee him probation simply because of his involvement and how serious this [drug] operation was and how much methamphetamine was brought back into Macon County by him."
In his sentencing hearing, Jeremy introduced documentary evidence and called a witnesses in support of his request for a suspended sentence. Following his counsel's argument before the trial court, the trial judge remarked "you've done a remarkable job in your brief outlining your client's position. I appreciate that. I don't think there's any question that substantial assistance has been given by this defendant." When the State conceded the issue, the judge remarked, "I mean, you can't argue against that at all. I know that substantial assistance has been given." The judge found in his discretion that substantial assistance had been rendered as provided by the statute and sentenced Jeremy to a suspended sentence of 90 to 120 months and 36 months supervised probation.
Nothing in the record of Jeremy's and Tice's sentencing proceedings following Defendant's trial indicates the solicitation of testimony that the State knew or should have known was false. For Tice, it appears that she accurately testified about her potential plea deal as offered to her by the State prior to trial, and the fact that she ultimately received probation does not retroactively render false her belief at trial that avoiding jail time was unlikely. As for Jeremy, he received a suspended sentence and probation not because of his plea deal or the actions of the State, but because of his counsel's zealous advocacy following Defendant's trial and the trial court's decision to exercise its discretion in finding substantial assistance-a decision the trial court stated it had decided to reach prior to hearing any argument by the State on the question. In other words, Tice and Jeremy testified to their understanding of their respective possible and actual plea deals at the time of Defendant's trial, and there is no indication that they had been led to believe, either by the State or counsel, that alternative outcomes were likely or possible.[2] As a result, we deny Defendant's MAR.
B. Standard of Review Applicable to Motions to Dismiss for Insufficient Evidence
Defendant argues that the trial court erred in denying his motion to dismiss the charge of conspiracy to traffic in methamphetamine, a question we review de novo . State v. Smith , 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). Resolving the issue requires us to ask whether "substantial evidence exists to support each essential element of the crime charged and that defendant was the perpetrator." State v. Morgan , 359 N.C. 131, 161, 604 S.E.2d 886, 904 (2004). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." State v. Earnhardt , 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982) (quotation marks and citation omitted). Further, we "must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences." Morgan , 359 N.C. at 161, 604 S.E.2d at 904.
C. The Trial Court Properly Denied Defendant's Motion
A conspiracy to commit a crime "is an agreement between two or more persons to do an unlawful act or do a lawful act in an unlawful way or by unlawful means." State v. Massey , 76 N.C. App. 660, 661-62, 334 S.E.2d 71, 72 (1985) (citation omitted). In order to survive a motion to dismiss levied against a conspiracy charge, the State must introduce evidence to show "an agreement to perform every element of the underlying offense." State v. Dubose , 208 N.C. App. 406, 409, 702 S.E.2d 330, 333 (2010) (citation omitted). Thus, the State in this case was required to show Defendant conspired to "(1) knowingly possess[ ] or transport[ ] methamphetamine, and (2) that the amount possessed was greater than 28 grams." State v. Shelman , 159 N.C. App. 300, 305, 584 S.E.2d 88, 93 (2003) (citations omitted); see also N.C. Gen. Stat. § 90-95(h)(3b) (2017). While it is true that "it is the amount of contraband agreed upon, not the amount actually delivered, which is determinative in a narcotics conspiracy case[,]" State v. Rozier , 69 N.C. App. 38, 49, 316 S.E.2d 893, 900 (1984), "evidence of the cumulative quality of controlled substance that a defendant sells in the course of a single open-ended conspiracy is sufficient to support his conviction for conspiracy to sell that quantity even though the agreement of the conspirators is silent as to exact quantity." State v. Williamson , 110 N.C. App. 626, 631, 430 S.E.2d 467, 470 (1993).
For the State to satisfy this evidentiary burden, "a conspiracy may be established from circumstantial evidence, [although] there must be such evidence to prove the agreement directly or such a state of facts that an agreement may be legally inferred." Massey , 76 N.C. App. at 662, 334 S.E.2d at 72. "[T]he State need not prove an express agreement; evidence tending to show a mutual, implied understanding will suffice." State v. Morgan , 329 N.C. 654, 658, 406 S.E.2d 833, 835 (1991). "The proof of a conspiracy may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." State v. Lawrence , 352 N.C. 1, 25, 530 S.E.2d 807, 822 (2000) (quotation marks and citation omitted). Mere association with a person who commits the underlying crime, however, is insufficient to demonstrate the existence of a conspiracy. See State v. Arnold , 329 N.C. 128, 142, 404 S.E.2d 822, 831 (1991) ; Massey , 76 N.C. App. at 662, 334 S.E.2d at 72.
Defendant concedes in his brief that the evidence, taken in the light most favorable to the State, shows that Defendant "assisted Hamilton in finding someone willing to do a run on Hamilton's behalf" and that the "evidence permitted a reasonable inference that [Defendant] and Hamilton had an agreement to assist Jeremy and Tice procure methamphetamine in Atlanta." Defendant's sole argument, then, focuses on whether there was sufficient evidence to show the agreement in question was to "traffic in more than 400 grams of methamphetamine." Reviewing the evidence in the light most favorable to the State, we hold that the trial court did not err in rejecting this argument and denying Defendant's motion to dismiss.
As conceded by Defendant, the evidence shows that he and Hamilton were working together to arrange a drug-run to Atlanta, stopping at the Stanley residence on two occasions in search of a mule. It also shows that he and Hamilton arrived together to deliver $17,000 to Jeremy for use in the run. While there is no direct evidence to show Defendant knew the exact amount of drugs to be bought or money to be used in the transaction,[3] sufficient circumstantial evidence exists, in concert with the direct evidence, to support an inference that he knew of the amount involved: (1) Jeremy considered Defendant to be Hamilton's "partner" and "best friend[;]" (2) Defendant split the drugs acquired from previous drug-runs with Hamilton; (3) Defendant would sometimes receive the drugs acquired in previous runs directly from the mule; (4) he would sell those drugs at Hamilton's home and on Hamilton's behalf; and (5) he had performed drug-runs in the past when Jeremy was learning to be a mule. In other words, the evidence shows that Defendant was involved at every level of the illegal operation, from training mules to wholesale acquisition, distribution, and retail sales. Furthermore, when Defendant picked up the decoy at the Welcome Center, he asked Jeremy only what was wrong, suggesting that he himself was unable to determine what was amiss with the situation and that the weight of the drugs he observed, handled, and ultimately placed in the floorboard of his car was the weight he expected to receive from Jeremy. Finally, Defendant was an active participant in the run itself, calling Jeremy to keep him apprised of police checkpoints. Taking this evidence in the light most favorable to the State, we hold that sufficient evidence was presented as to each element of the conspiracy, including an agreement for a trafficking amount.
This holding is supported by our decision in Rozier , despite Defendant's contention that it bolsters his argument. In that case, two defendants argued that there was insufficient evidence to support a conspiracy to traffic cocaine because, although the agreement was to purchase an ounce, "[t]he amount of cocaine which actually changed hands ... was 27.71 grams." 69 N.C. App. at 48, 316 S.E.2d at 900. This Court was asked to answer the question of whether a party can be convicted of conspiracy to traffic in cocaine where the second element of the substantive crime of trafficking cocaine itself would not be satisfied, i.e. , that "the cocaine weigh[ ] 28 grams or more." State v. Rodelo , 231 N.C. App. 660, 664, 752 S.E.2d 766, 771 (2014). Our holding that the agreed upon amount-and not the amount actually trafficked-was dispositive of the question, then, was merely a recognition of the rule that the evidence supporting a conspiracy charge must demonstrate "an agreement to perform every element of the underlying offense." Dubose , 208 N.C. App. at 409, 702 S.E.2d at 333 (citation omitted).
More directly analogous to this case than the language quoted above was an argument presented by one of the Rozier defendants, Harold Carter. There, it was defendant Rozier who actually conducted the sale and negotiated the amount of cocaine to be purchased, with Carter acting as a facilitator without direct knowledge of the amount of cocaine exchanged. Rozier , 69 N.C. App. at 41-42, 316 S.E.2d at 896-97. We nonetheless held that the circumstantial evidence showed Carter engaged in a conspiracy to traffic. Id. at 48-50, 316 S.E.2d at 900-01. First, we noted that the evidence was sufficient to show Carter's participation in some kind of drug conspiracy:
The State presented evidence that Carter and Rozier were regular companions and that both had access to narcotics, that Carter relayed messages concerning the subject cocaine transactions to Rozier, that Carter twice accompanied Rozier to the meeting place ... and that Carter was physically present when the cocaine was exchanged for cash in his home. This sufficed to allow the question of his participation in a drug conspiracy to go to the jury.
Id. at 50, 316 S.E.2d at 901 (emphasis in original). We then addressed specifically whether the evidence showed a drug conspiracy to transact in a trafficking amount:
The State established prima facie Rozier's and Carter's involvement in the conspiracy, and therefore Rozier's statements regarding the amount of narcotics became admissible against Carter as evidence of conspiracy to traffic . The conviction of defendant Carter for conspiracy to traffic involving the ... transaction is thus supported by sufficient evidence.
Id. (emphasis in original).
Here, just as in Rozier , the evidence supports the conclusion that Defendant was party to a drug conspiracy, a reading of the record that Defendant does not contest. Indeed, many of the facts giving rise to Carter's involvement in the conspiracy in Rozier are found here. Thus, just as Rozier's knowledge of the amount of cocaine to be exchanged in that case with Carter's help constituted sufficient evidence to support the inference that Carter conspired to traffic an amount satisfying the elements of the crime, Hamilton's, Jeremy's, and Tice's apparent knowledge of the amount of drugs to be purchased in the run gives rise to the inference that Defendant conspired to traffic in that amount.
III. CONCLUSION
For the foregoing reasons, we hold that the trial court did not err in denying Defendant's motion to dismiss the charge for conspiracy to traffic in methamphetamine.
NO ERROR.
Report per Rule 30(e).
Judges BRYANT and DIETZ concur.

The term "mule" is a colloquialism referring to a person who physically transports illicit drugs on behalf of another.

When it comes to evaluating how a plea deal might impact the credibility of a witness, it stands to reason that the witness's understanding of the plea deal, and not the existence of a better deal unknown to the witness, is the relevant consideration.

Even if Defendant only knew the amount of money involved in the run and not the exact weight of the drugs to be purchased, evidence was introduced showing Defendant sold methamphetamine at retail for $900 an ounce, making the drug-run in question-without accounting for discounts at wholesale-one involving at least 18 ounces, or 510.291 grams.